**Eugene PAYNE, Appellant,**

v.

**HARTFORD FIRE INSURANCE COMPANY, Appellee.**

**No. 6807.**

Court of Civil Appeals of Texas.

Beaumont.

Nov. 3, 1966.

H. P. Wright, Port Neches, for appellant.

O. J. Weber, Keith, Mehaffey & Weber, Beaumont, for appellee.

PARKER, Justice.

Eugene Payne sued Hartford Fire Insurance Company to recover the proceeds of a fire insurance policy. The jury's finding to the sole issue was:

"Special Issue No. 1

"Do you find from a preponderance of the evidence that Eugene Payne intentionally procured the burning of his house on August 1, 1962, for the purpose of collecting insurance?

"Answer 'We do' or 'We do not'.

"Answer: *We do*."

Upon the jury verdict, judgment was rendered that Payne take nothing. The parties will be designated by name or as in the trial court.

Plaintiff asserts error on the part of the trial court in overruling plaintiff's special exception to Paragraph 6 of defendant's second amended original answer. In such answer, defendant pleaded that the plaintiff was not entitled to recover because the fire which destroyed his building and contents was not accidental, but instead was a fire started either by the plaintiff himself or by his agent, or one acting under his direction and at his request, thus pleading the defense of arson. Supplementing this, defendant pleaded in Paragraph 6:

"For further and special answer herein, if such be necessary, defendant would show that plaintiff has had a number of other fires occur to other property that he owns at other times and other places, and that proof of these other fires under the circumstances under which they occurred tie in with and go to show intent, identity and system with respect to the fire which is alleged to be the basis of the loss upon which this suit is brought."

Plaintiff's special exception to such paragraph was:

"Plaintiff specially excepts to Paragraph No. 6 of defendant's second amended original answer, (then quotes the paragraph set out above), because:

"(a) The matters alleged are completely immaterial and irrelevant to any issue in this cause and unless stricken will serve only to bring prejudice to bear upon the plaintiff in this case.

"(b) This is an attempt to prove arson in the present case by showing that plaintiff had had other fires and there is no allegation or can there be that the prior fires were fraudulent.

"(c) These allegations fail to specifically set out any particulars with regards to the alleged prior fires; they do not give the time, location, or any other particulars about the circumstances surrounding the same so that it is impossible for the Court to determine any probative

value they might have, which they could not have in any event.

(d) Allegations of this nature cannot help but to bring prejudice to bear upon the plaintiff and unless there are allegations that the prior fires were fraudulent and the result of a criminal act, then any possible probative value is so greatly outweighed by the prejudicial harm that will be brought to bear that they should be stricken from the pleadings.

Of which special exception plaintiff prays judgment of the Court."

This exception of plaintiff's was overruled by the trial court. On the same day such exception was filed, plaintiff filed a motion in limine stating "that he had had several fires prior to the fire loss made the basis of this suit, but would show they are completely immaterial and irrelevant to any issues in this case." So, plaintiff and his counsel knew of the fires to which the defendant was referring. At the trial, plaintiff testified as to his prior fires, did not claim surprise, withdraw his announcement of ready or request continuance of the case. The general rule is that prior transactions are irrelevant, immaterial and highly prejudicial and in violation of the well settled general rule that res inter alios acts are incompetent evidence, particularly in a civil case. The exception to such said general rule is that wherever a prior plan, scheme, system, intent or design becomes relevant in a civil case, evidence may be offered to establish such prior plan, scheme, system or design, which included the doing of the act charged as a part of its consummation. Texas-Osage Co-operative Royalty Pool, Inc. v. Cruze, 191 S.W.2d 47 (Tex.Civ.App. 1945, n.w.h.); 2 Wigmore on Evidence § 354:

" * * * Where the act itself is conceded or otherwise proved, and the object is to negative inadvertence or accident, the recurrence of similar acts of firing by the defendant tends to diminish the possibility of an innocent explanation. Moreover, the principle of *Anonymous Intent* (ante, sec. 303) is recognized as being here occasionally of peculiar utility; i. e. the recurrence of a similar fire may tend decidedly to negative innocent intent, even though the author of the other fires is not shown; thus, the prosecution having negatived innocent intent in the present fire by whomsoever set, the defendant may be shown to have kindled it."

Defendant's pleading does not detail the particular circumstances of the prior fires that tie in with and go to show intent, identity and system with respect to the fire upon which the instant suit is based. Paragraph (c) of plaintiff's exception goes directly to this point of generality. Each of the previous fires destroying plaintiff's houses occurred in the early morning when he and his family were absent subsequent to the removal of some of the personal effects of substantial value from each house, except one in which they never lived with each such fire and the fire under consideration occurring at a time when the plaintiff was in dire financial circumstances. In each previous instance he collected substantial money under a fire insurance policy. All of such circumstances were well known to the plaintiff. Plaintiff in no manner, except by this exception to the pleadings, availed himself of the discovery processes under T.R.C.P. such as deposition, request for admission, etc., by which the detailed facts in question could have been ascertained, if unknown to plaintiff. That the plaintiff knew all such circumstances is supported by his own testimony as to his prior losses of buildings by fire and collection of fire loss from insurance companies.

There is no showing that defendant's pleading contained in Paragraph 6 caused the rendition of an improper judgment, and this point of error is overruled. Hartford Accident & Indemnity Co. v. McCardell, 369 S.W.2d 331 (S.Ct.1963); Rule 434, Texas Rules of Civil Procedure.

■ The trial court overruled plaintiff's motion in limine above referred to in which such motion is quoted in part:

"1. Plaintiff admits that he has had several fires prior to the fire loss made the basis of this suit, but would show that they are completely immaterial and irrelevant to any issue in this case. That to mention them in this cause would serve the sole purpose of bringing prejudice to bear upon the Plaintiff and would not aid nor be proper in the determination of any material issues in this case.

"WHEREFORE, premises considered, Plaintiff moves in advance that the Court instruct counsel for the Defendant, its witnesses and the Defendant not to refer nor elicit the above matters in any way and that such matters and evidence be stricken from the evidence in this cause prior to trial."

The evidence ties in the prior fires and their recurrence not only to negative innocent intent on the part of Payne but show by circumstantial evidence a scheme, system, intent or design which the jury in this civil case could find to exist. Such motion in limine was properly overruled by the trial court.

Plaintiff's point of error contending that the trial court erred in admitting testimony concerning prior fires destroying plaintiff's property covered by insurance is overruled.

■ Under his first point the appellant complains that there was "no evidence" and insufficient evidence to support the jury's answer to the sole issue presented to it for consideration. Plaintiff did not take any of the following procedural steps in the trial court: (a) motion for instructed verdict; (b) objection to the submission to the jury of such issue; (c) motion for judgment notwithstanding the jury's verdict; and (d) motion to disregard the jury's answer to such special issue. Since none of these procedural steps were taken by the plaintiff, his "no evidence" points

cannot be considered on this appeal. In considering the insufficient evidence points all of the evidence is to be considered in determining whether the evidence is sufficient to support the jury's finding to the sole issue in the case. A charge of fraud in a civil action, even though it involves the charge that a crime had been committed, as in this case, does not have to be sustained by evidence beyond a reasonable doubt as in a criminal prosecution. The presumption of innocence must be indulged. The burden was on the defendant to sustain its defense of arson by a preponderance of the evidence. The issue submitted to the jury was so framed. The presumption is against the loss by fire having been caused by the insured's own wilful or intentional act. Arson may be established by circumstantial evidence.

Eugene Payne began building a frame dwelling house three miles north of Silsbee in 1959. The house was not completely finished at the time of the fire; the outside brick had not been laid; some of the inside panelling was not up. The brick was on the ground. Until a few months prior to the fire it had been occupied as his home. Defendant issued a Texas standard homeowner's policy on such house for a period of 3 years providing for $20,000 coverage on the house, $8,000 coverage for unscheduled personal property within the house and $4,000 coverage for additional living expense for the insured in the event of loss. The house and its contents were destroyed by fire on August 1, 1962 while the policy was in full force. The actual cash value of the personal property in the house was $5,068.35. His additional living expense amounted to $100 per month and a reasonable time to rebuild would be 6 months. Plaintiff owed an indebtedness on this place slightly under $3,500. The foregoing facts were agreed and stipulated to by the parties. This fire occurred in the early morning hours, about 4:00 a. m., of August 1, 1962. There was an explosion and a fire. The color of the blaze was orange-red.

Plaintiff Eugene Payne testified he did not know what caused the fire. He and his family were not at home at the time. For several months prior to the fire, plaintiff and his family had been living at Dr. Copeland's camp in Polk County. Before the fire he took an heirloom sewing machine, deep freeze, refrigerator, a stove, iron bedstead and mattress from this home at Silsbee to Polk County. He admitted he was in Silsbee on Monday preceding the burning of his house early Wednesday morning. Plaintiff admitted he had been forced out of the building business in 1959 by his creditors; that he had a number of judgments against him; that he knew the fire was investigated by the National Board of Fire Underwriters, and understood it was also investigated by Dwayne Overstreet, the County Attorney of Hardin County. With respect to prior fires on property he owned, Payne testified that in 1959 a fire destroyed a house of his located on the same tract of land as his last house which burned in August of 1962; that he collected $5,000 insurance on the house that burned in 1959; in 1960 a fire destroyed a house he owned on which he collected $3,602.63 on an insurance policy covering that house; that about June 1960 he had a fire on an automobile, collecting on an insurance policy covering it. At the time of the fire his sole remaining substantial asset was this house that burned on August 1, 1962. He admitted that the only two people who would be paid any money from the insurance policy if the house burned was the mortgagee and himself. He admitted he had no gasoline in the house that burned.

The house and contents were a total loss. It was uncompleted, unfinished and overbuilt in the area where it was located. The evidence was that an overbuilt house and an unfinished house were difficult to sell.

Defendant contended that Melvin Graham was the person Eugene Payne procured to set fire to Eugene Payne's house that burned on August 1, 1962.

The fire chief of Silsbee testified that in the last 4 years the fire department had been called to Eugene Payne's house or his son's house 5 or 6 times for grass fires, plus 2 fires at Payne's son's place and 2 at Eugene Payne's houses. That the fire at Eugene Payne's place on August 1, 1962 occurred at 4:14 a. m. The fire at another place of Eugene Payne's was about 3 a. m. Mrs. Eugene Payne verified the circumstances as to time and total destruction by fire on houses owned by them.

Eugene Payne and Melvin Graham, who died as a result of injuries and burns received from the fire and explosion, had conferred by themselves for an hour in a back room of Graham's tire store in the afternoon of either Monday or Tuesday at about 5:30 p. m. before the fire of 4 a. m. Wednesday morning. Melvin Graham's business was not prosperous at the time of the fire. On Monday before the Wednesday of the fire, Melvin Graham was asked about a picnic on the next evening and he replied he had a deal but "we won't be gone long".

Plaintiff called James S. Conner as a witness. He was the ambulance driver on August 1, 1962 who went to Melvin Graham's house in the early morning hours to pick up Melvin Graham, who was badly burned. Melvin Graham walked out of his house, lay down on the cot and they put him in the ambulance. On the way to the hospital Melvin Graham asked his wife, Doris Jean Graham, who had the kids and if Mama Payne was in the house. Plaintiff offered this as part of the res gestae, contending that it was not the witness speaking but the whole circumstance: "Here is a man who is badly burned, certainly under severe pain, on the way to the hospital in the ambulance extemporaneously speaking after the accident was over, so it would be a res gestae statement." The court admitted the evidence. The admission of evidence of res gestae is usually left largely to the judicial discretion of the trial court. Keystone-Fleming Transport Inc. v. City of Tahoka, Tex.Civ.App., 315 S.W.2d 656, wr.ref'd, n. r. e. These declarations were

made under circumstances raising a reasonable presumption that they were spontaneous utterances of thoughts brought about or springing out of the transaction and so soon thereafter as to exclude any presumption that they were results of premeditation or design. Therefore, they were admissible as res gestae. Pacific Mutual Life Ins. Co. of California v. Schlakzug, 143 Tex. 264, 183 S.W.2d 709; Houston Oxygen Co. v. Davis, 139 Tex. 1, 161 S.W. 2d 474, 140 A.L.R. 868, 869 reversing Tex. Civ.App., 145 S.W.2d 300; City of Houston v. Quinones, 177 S.W.2d 259, 142 Tex. 282 reversing Tex.Civ.App., 172 S.W.2d 187.

■ In the emergency room of the hospital where Melvin Graham and his wife had been taken in the ambulance, Kenneth Graham, the brother of Melvin Graham, testified Doris Jean Graham made the statement below:

"Q Would you tell us what Doris Jean told you?

A She told me that Melvin had taken a bribe from the Paynes to do this job, and she immediately told me not to tell anybody about what she had just told me."

This testimony was not only admissible to impeach Doris Jean Graham's testimony denying she ever made such a statement but was proof of the truth of her statement as part of the res gestae. After seeing the disaster, knowing her husband was in serious condition, going with him in the ambulance and, thence, to the emergency room, her statements were a spontaneous utterance of thoughts created by and springing out of this disastrous fire, excluding any presumption they were the result of premeditation or design. Both statements are considered by this court as proof of the truth of the matters stated. Plaintiff did not object to this statement by Doris Jean Graham made to her brother-in-law, Kenneth Graham. It will be noticed that she did not state "My husband told me he was bribed", but her statement is: "that Melvin had taken a bribe from the Paynes to do this job."

The mother of Melvin Graham testified that on Tuesday she went to the store belonging to Melvin Graham. There she saw her son, Melvin, talking to Eugene Payne at about 5:30 in the evening. The mother of Melvin Graham further testified that her son, Melvin, never seemed to have any money. His financial condition was not good and he told his mother he was supposed to get a good-sized check before long that ought to take care of everything. Before the fire the mother of Melvin Graham went with her daughter-in-law, Doris Jean Graham, to look at a new automobile her daughter-in-law wanted to purchase.

Doris Jean Graham testified that before the fire she had talked with her husband, Melvin Graham, about purchasing a new air-conditioned car and building a new den. She testified that after the fire she got a new air-conditioner for her car. On the night of the fire her husband, Melvin Graham, heard some noise and got up to see what it was all about; that they were awake before they heard the noise and had smoked a cigarette. She went as far as the door when Melvin went to investigate this noise; he told her to latch the screen; that Melvin anticipated there was someone out there, did not take a gun but took a light. When her husband went to investigate the noise he put on some working clothes that he had used painting. She heard a "swish of air" followed by this explosion and saw the fire as she was standing inside the screen of her front door. She did not know what Melvin did when he went into the house. She did not hear anything prior to hearing a loud explosion. The entire Payne house seemed to blaze when the explosion occurred. She saw her husband, Melvin, pick himself up and return to the house, she unlatched the screen, let him in, helped him take off his clothes, put vaseline on his face, put his burned and torn clothes in the washing machine, helped him put on something else to wear, went with him in

the ambulance to the hospital. She denied that she had ever made a statement to Kenneth Payne or anybody else that her husband was bribed by Eugene Payne to start the fire that destroyed Payne's house. She admitted that there was lots of talk in that neighborhood about Payne making a living out of burning houses he owned and collecting the insurance. She denied that she was drinking whiskey that night. She admitted her children were not at their home the night of the fire but were at her mother's. She admitted that she phoned her father to get the discarded clothes of Melvin's and take them out of the house. This clothing of Melvin Graham was found under some tires in the garage of Doris Jean Graham's father by Dwayne Overstreet. They were placed in a can, taken to Houston, analyzed by an expert and found to contain gasoline. Considering the fact the clothes had been placed in water, there was an unusual amount of gasoline found in such clothes, according to this expert.

The mother of Melvin Graham testified her son was ordinarily a calm person. That on Monday before the fire her son was very nervous and upset. On the next day, the condition of her son, Melvin, was worse. Without doubt, Melvin Graham was not in good financial condition. Doris Jean Graham had whiskey on her breath in the emergency room of the hospital.

Mrs. Ruth Geisendorf lived about half a block from the Payne house. She was awakened by the explosion which was loud. Her bedroom was lighted all over from the light of the fire. It was the Payne house on fire. The smoke was black; the flame was large and it seemed to be orange and red. Within 5 minutes the house was burning so that no one could go near it. It was night.

Kenneth Graham, Melvin Graham's brother, also testified that he and Melvin had been painting a room in Melvin's house prior to the fire; that they used a water base paint and did not clean it up with gasoline. He had worked for his brother in his tire shop.

Malcolm R. Williams, an expert arson investigator with the National Board of Fire Underwriters, and Hugh Keepers, a chief inspector of the Liquified Petroleum Gas Division of the Texas Railroad Commission, each qualified as experts in their field.

Hugh Keepers, the chief inspector of the Liquified Petroleum Gas Division of the Texas Railroad Commission, was a witness. His investigation began August 1, 1962 at 5:30 p. m. at the scene of the fire. He found the house completely gone except unburned portions of the wall. The north wall was away from the original structure some 8 feet from the original foundation with the inside of the wall facing the sky. The door was about 50 feet from the house. It had an impression from something on it. He found no evidence that the door hit Mr. Graham, indicating to him that he was inside the house when the explosion occurred. He found skin indicating that Melvin Graham had been blown about 59 feet away from the dwelling. Later he learned that a liquid was distilled from the clothing of Melvin Graham, was tested and found to be gasoline. He accompanied Mr. Overstreet and was present at the time this test was made. He checked with the local fire marshal's files and found that there had been a number of fires in the general area, by the same owner, Mr. Payne, and that these fires had been at night when the houses were under construction or unfinished in each case. In each case, the financial status of the owner was poor. From eye witnesses he obtained information that there was a swish of air followed by an explosion, characteristic of gasoline explosions. There was an instantaneous development of the flame immediately following the explosion according to Ruth Geisendorf and Doris Jean Graham. It was his opinion that gasoline had been spread inside the house sufficient in amount to produce this kind of explosion. The front door being scorched but not burned indicated to him that it was in a closed position at the time of the explosion. In his opinion, if

Melvin Graham had stepped inside the door, then the door was closed, for if he had been outside the house and behind the door this would have offered some protection to him against the fire and against burns. The door was substantially intact after being blown out from the house. Graham's burns were extremely bad. Keepers found several 5-gallon cans in the area, but only one with a perforated bottom. He found a kitchen outlet of the butane system with the valve intact in the "off" position. He checked the water heater butane outlet and it was in "on" position. He checked the butane tank and it contained a mixture of butane and propane which had been odorized. The records of those supplying the butane tank showed on February 15, 1962 it had 90 gallons. When he examined the tank, it contained 65 gallons. He considered the water heater would have consumed 25 gallons from February 15, 1962 to August 1, 1962. Keepers was advised that the clothing of Melvin Graham contained gasoline. He expressed his opinion that the fire was a gasoline fire and not of any other petroleum product and not butane; that it was incendiary and that Melvin Graham was involved in the fire.

Malcolm Williams testified he was employed as an arson investigator for the National Board of Fire Underwriters; that he conducted an investigation of this fire, finding that the house was completely destroyed except for portions of a back wall which was lying with the inside facing to the sky; that this was an explosion from gasoline fumes which are lighter than air which, when exploded, would have the greatest force at the ceiling and force the upper part of the wall out—that the converse would be true as to a butane explosion; that characteristics of a gasoline or petroleum product fire are heavy, black smoke and orange-red flames. It was the opinion of Malcolm Williams as an expert arson investigator that the fire at Eugene Payne's place was caused by gasoline or petroleum products other than butane; that based upon his experience in the field of

arson that this fire at Eugene Payne's place on August 1, 1962 was of incendiary origin; that his investigation eliminated any possibility of pyromaniacs around the Payne place or any people with grudges against the Paynes; that in his expert opinion the fire was procured by Eugene Payne because he was in financial difficulty.

Arnold Williams, the admittedly qualified expert in chemical analysis, testified that the substance obtained from the clothes that Melvin Graham was wearing at the time of the fire was a petroleum base naptha, probably motor gasoline, and was definitely not paint, kerosene, turpentine, paint thinner, lacquer thinner, or paint solvent.

■ The above evidence supports the jury's finding that Eugene Payne intentionally procured the burning of his house on August 1, 1962, for the purpose of collecting insurance. Mott v. Spring Garden Ins. Co., 154 S.W. 658 (Tex.Civ.App.1913, n.w.h.); Williams v. Bankers Fire & Marine Ins. Co., 277 S.W.2d 742 (Tex.Civ. App.1955, wr.dism'd). Plaintiff's contention that the evidence is insufficient to support the answer of the jury to the sole issue in the case is overruled.

■ Plaintiff's points of error 5 and 6 are as follows:

"5. The Court erred in overruling Plaintiff's motion to strike from the evidence the clothing of Melvin Graham, the material found in such clothing and the testimony concerning the same, and to instruct the jury not to consider such evidence.

"6. The Court erred in overruling Plaintiff's motion to strike the testimony of the defendant's expert witnesses that were based upon evidence given to them by the Deputy State Fire Marshal."

Under V.A.T.S. Insurance Code, Art. 5.46, the State Fire Marshal may not testify in a civil suit nor shall the result of any such investigation be given in evidence upon the trial of any civil action upon a policy of

insurance. The State Fire Marshal, William Alvin Schmidt, did investigate but was not allowed to testify. Points of error 5 and 6 were based upon the contention that in the investigation of the state fire marshal he discovered evidence which was admitted into evidence upon the trial. The same facts were ascertained by Dwayne Overstreet and by Malcolm Williams. Overstreet and Schmidt at the same time found the clothing that Melvin Graham was wearing when he was burned. Overstreet testified he got the clothes from Graham's father-in-law. Overstreet said he took the clothes to the crime lab in Houston, Texas, and that a substance was distilled out of them. The clothes were introduced into evidence with Overstreet explaining where the clothing was burned. Neither Overstreet nor any other witness testifying were under the control of the state fire marshal. The state fire marshal testified that the county attorney Overstreet did not work under his direction or control nor did Malcolm Williams with the National Board of Fire Underwriters, nor did Hugh Keepers of the Texas Railroad Commission, Liquified Petroleum Gas Division; that each of them made their own investigation, though they worked together on occasion when they were all there but that at such times the fire marshal was not controlling their actions nor did he have any authority to do so. Malcolm Williams testified that he did not work under or with or give his report to the state fire marshal of Texas. It is apparent that Hugh Keepers worked for the Texas Railroad Commission. The motion in limine to exclude the testimony of Alvin Schmidt was granted by the trial court. There is no evidence that Overstreet was acting for the state fire marshal. There is no evidence that the state fire marshal was requested by the county attorney or by the defendant to investigate this

fire. The fact that Overstreet and the state fire marshal, each conducting his own independent investigation, happened to work together at times did not make Overstreet's testimony inadmissible. Points of error 5 and 6 are both overruled.

Plaintiff also contended that it was error for the trial court to admit the testimony of the witness, Malcolm Williams, to the effect that it was his opinion that Melvin Graham set this fire at the special instance and request of the plaintiff Eugene Payne over proper objection. In the trial court plaintiff objected to the opinion of Malcolm Williams upon the sole ground that it was based purely on conjecture. Plaintiff in his point of error, however, contends that it invades the province of the jury. This court held in Hooten v. Dunbar, Tex.Civ.App., 347 S.W.2d 775, the party must stand or fall upon the objection that is made in the trial court. Further, Malcolm Williams was a qualified expert in the field of arson. He had facts before him upon which to base his opinion. Although there are opinions to the contrary, the more recent opinions hold that an expert witness' opinion is admissible even though his answer embraces the very issue on trial, as against an objection that it invades the province of the jury, since it is admitted to aid the jury, not control it, in the determination of the issue. Federal Underwriters Exchange v. Cost, 132 Tex. 299, 123 S.W.2d 332 (Tex.Com.App.1938, opin. adopted by S.Ct.); Scalf v. Collin County, 80 Tex. 514, 16 S.W. 314 (S.Ct. 1891); Doherty v. Dean, 337 S.W.2d 153 (Tex.Civ.App.1960, n. w. h.); Hooten v. Dunbar, supra; Houston & T.C.R. Co. v. Ellis, 134 S.W. 246 (Tex.Civ.App.1911, wr.ref'd). This point of error is overruled.

Judgment of the trial court is affirmed.