The ST. PAUL GUARDIAN
INSURANCE COMPANY,
Appellant,

v.

Teri Lynn LUKER and Paul Kimbel
Luker, Appellees.

No. 6-90-0023-CV.

Court of Appeals of Texas,
Texarkana.

Dec. 27, 1990.

Second Rehearing Overruled Jan. 23, 1991.

**616**

Judith H. Winston, Cowles & Thompson, Dallas, for appellant.

Terry D. Bailey, Carthage, for appellees.

Before CORNELIUS, C.J., and BLEIL and GRANT, JJ.

## OPINION

GRANT, Justice.

This appeal arises from a suit by Paul Kimbel Luker (Kim) and his wife, Teri Lynn Luker (Teri) to recover for loss of household goods in a fire under a homeowner's policy. The policy was issued to Emmett Luker, Kim's father, by the St. Paul Guardian Insurance Company, which paid the structural damage claim but denied the claim for loss of the Lukers' household goods. Kim and Teri Luker also brought a bad faith action against St. Paul for its denial of the claim. The jury found both contractual damages in the amount of $17,000 and tort damages in the amount of $50,000 [1] for mental anguish and $15,000 for exemplary damages.

St. Paul contends that the trial court erred in overruling its motion for judgment non obstante veredicto because there was no evidence or insufficient evidence that it acted in bad faith; in overruling its motion for new trial because the evidence was factually insufficient to support the jury findings that its acts were the producing cause of any damage to Kim and Teri Luker or that they suffered mental anguish in the past; in overruling its motion for new trial about the amount of damages for past mental anguish awarded by the jury because the amount was excessive; in denying its motion for judgment n.o.v. because it owed no duty of good faith and fair dealing to Kim and Teri Luker; in holding that as a matter of law a stipulation precluded St. Paul from asserting that Kim and Teri Luker were not the insured parties under the policy and that it therefore owed them no duty to act in good faith; and in overruling its motion for new trial because the jury's answer to the arson issue was against the great weight and preponderance of the evidence.

At approximately 12:15 a.m. on the morning of June 12, 1985, a fire caused structural damage to the house in which Kim and Teri Luker were residing and also damaged or destroyed their household belongings. Although Emmett Luker owned the house, he was not living in it; rather, it was occupied by Emmett's son and daughter-in-law, Kim and Teri Luker.

The house was originally owned by Kim and his previous wife, Kathleen. In the divorce proceeding between Kim and Kathleen, the court had ordered the house sold and the mortgage and certain bank loans paid off. Emmett Luker had advanced Kim $17,000 towards construction of the house, but he did not place a lien against it.

---

1. $30,000 to Teri Luker and $20,000 to Kim Luker.

The house was offered for sale but no offers were received at asking prices of approximately $99,500 and, later, $89,500. Ultimately, Emmett Luker bought the house at a foreclosure sale. He agreed to let Kim and his new wife, Teri, live in the house and make the payments on the new mortgage until he sold the house. This action increased Kim's house payments from approximately $650 per month to $900 per month.

After the foreclosure sale, Kim met with a local insurance agent, Lynn Joffrion, and had the insurance policy rewritten to reflect that Emmett was the new owner of the house and to reduce the contents coverage from $40,000 to $27,000. Kim told Joffrion that he and Teri would continue to live in the house. He personally paid the full insurance premium on it before and after the fire until St. Paul settled Emmett's insurance claim for damage to the structure. Kim testified that Joffrion assured him that he was covered by the revised policy as if he were the policy holder.

For the seven days prior to the fire, Kim had been working on an oil rig in the Gulf of Mexico, and Teri had been visiting with Kim's mother in Houston. On the night of the fire, both Kim and Teri had arrived back in the Carthage area and spent that night at the home of Teri's mother, approximately 14 miles from Carthage where the fire occurred. Kim testified that he and Teri were asleep there when they were notified that their home had been destroyed by a fire.

Emmett Luker, the named insured, filed a claim with St. Paul for the policy limits of $90,000 for the house and $27,000 for damages to the personal property owned by Kim and Teri. The policy gave Emmett an option to extend coverage to the personal property of others.

St. Paul negotiated a settlement with Emmett in the amount of $76,865.04 for damage to the house, but it denied Emmett's claim for personal property losses on three grounds: that the fire was caused by arson by Kim and Teri or by someone instructed by them; that Kim and Teri misrepresented their losses by concealing their personal involvement in the fire and by failing to report truthfully the extent and valuation of the destroyed personal property; and that the policy issued to Emmett insured only Emmett's interest in any personal property on the premises and not that of Kim and Teri.

Teri, later joined by Kim, sued St. Paul and the insurance agent who issued the policy, Joffrion Insurance Agency, alleging that the agent misrepresented that the personal property of Teri and Kim would be covered under the policy issued to Emmett. On May 8, 1987, to secure a dismissal of the Joffrion agency from the lawsuit and avoid a Deceptive Trade Practices Act action, St. Paul filed a stipulation with the court in which it agreed to drop its claim that the personal effects of Kim and Teri were not covered because they were not "insureds" under the policy at the time of loss. In relevant part, the stipulation stated:

> ST. PAUL GUARDIAN INSURANCE AGENCY agrees to drop as a defense to the Plaintiffs' claims, ST. PAUL'S previously made denial based upon interpretation that the policy, as written, would not legally cover the personal effects of the Plaintiffs because the Plaintiffs were not "insureds" under the policy at the time of the loss. Instead, the sole basis for denial of Plaintiffs' claim in this suit will henceforth be ST. PAUL'S allegation that the fire was intentionally set by the Plaintiffs or at their instance and that the Plaintiffs have misrepresented the circumstances and extent of their "loss."

We first address the issue of whether St. Paul owed a duty of good faith and fair dealing to Kim and Teri Luker. St. Paul argues that as a matter of law it owed no duty of good faith and fair dealing to Kim and Teri Luker because they were not insureds under the policy to Kim's father. The named insured in the policy was Emmett Luker, although the testimony showed that Kim Luker actually purchased the policy from the agent on his father's behalf, and the agent indicated to him that the personalty in the house belonging to Kim and Teri would be covered. The court in *Arnold v. National County Mutual Fire Insurance Co.*, 725 S.W.2d 165, 167

(Tex.1987), established that insurers have a duty to deal fairly and in good faith with their insureds. This duty arises from the parties' unequal bargaining power and other factors which place the insured at a disadvantage in dealing with the insurer. *See also Vail v. Texas Farm Bureau Mutual Ins. Co.,* 754 S.W.2d 129, 133 (Tex. 1988); *Aranda v. Insurance Company of North America,* 748 S.W.2d 210, 212 (Tex. 1988). A cause of action compensable in tort damages for breach of that duty exists when there is no reasonable basis for denial of the claim or for delay in payment, or for a failure on the part of the insurer to determine whether there was any reasonable basis for the denial or delay. *Arnold,* 725 S.W.2d at 167; *National Union Fire Insurance Company v. Hudson Energy Company,* 780 S.W.2d 417, 425–26 (Tex. App.—Texarkana 1989, writ denied). A bona fide controversy is a sufficient reason for failure of an insurer to make a prompt payment of a loss claim. *Id.,* at 426.

St. Paul contends that because Kim and Teri Luker's names do not appear on the insurance policy, Kim and Teri Luker were not parties to the policy and that St. Paul therefore did not owe them the duty of good faith and fair dealing which it owed to Emmett Luker as the insured.

■ The Lukers correctly argue that a third person not a party to a contract has a cause of action to enforce a contract if the contract was made for that person's benefit, citing *Quilter v. Wendland,* 403 S.W.2d 335, 337 (Tex.1966). The question of whether third party beneficiaries are owed a duty of fair dealing and good faith was not addressed by the Texas Supreme Court in *Arnold,* nor has the question come before the Supreme Court in any subsequent cases. Such a duty by the insurer has been applied to an injured third party in workers' compensation cases. *Aranda,* 748 S.W.2d 210.

In *Chaffin v. Transamerica Insurance Co.,* 731 S.W.2d 728, 732 (Tex.App.—Houston [14th Dist.] 1987, writ ref'd n.r.e.), the court stated that it knew of no Texas case in which a Texas court had broadened an insurance carrier's duty of good faith and fair dealing to provide a remedy to an injured third party. The court in that case, however, was dealing with a third party seeking recovery under a liability policy carried by the insured. Although a liability policy may provide compensation to third parties injured by the conduct of the insured, it does so based on the liability of the insured. The primary purpose for which a person purchases a policy is for his own financial protection. In the present case, the policy was purchased for purposes that included not only coverage of the house owned by Emmet Luker but also coverage of property belonging to a third party. The additional coverage was not on the basis of the insured's liability; rather, it applied in the event there was any loss to the third party beneficiary's property that was covered under the terms of the policy. In this situation, an insured voluntarily purchased coverage for the benefit of the third party, and recovery is not contingent upon negligent or willful tortious conduct by the insured to the third party. The policy reasons set forth in *Arnold* requiring a duty on the part of the insurers to deal fairly and in good faith with their insureds is set forth as follows:

> In the insurance context a special relationship arises out of the parties' unequal bargaining power and the nature of the insurance contracts which would allow unscrupulous insurers to take advantage of their insureds' misfortunes in bargaining for settlement or resolution of claims. In addition, without such a cause of action insurers can arbitrarily deny coverage and deny payment of a claim with no more penalty than interest on the amount owed. An insurance company has exclusive control over the evaluation, processing and denial of claims.

*Arnold,* 725 S.W.2d at 167. When a person contracts with an insurer for the benefit of another, both the person contracting and the third party have the right to expect that the insurer would owe the same duty to the designated third party as it would to the person making the contract. We hold that when an insurer agrees to insure a third party beneficiary under the

terms of an insurance contract, it owes the same duty of good faith and fair dealing to the third party as it does to the purchaser of the insurance.

 Another basis in the present case for so holding is the stipulation made by St. Paul. St. Paul argues that the issue of whether Kim and Teri were covered under the terms of the insurance policy was a matter of law, and that a stipulation as to matters of law is without effect and cannot bind the parties or the court, citing *Bankers Insurance Co. v. Black*, 466 S.W.2d 616 (Tex.Civ.App.—Tyler 1971), *rev'd on other grounds*, 478 S.W.2d 434 (Tex.1972). However, if St. Paul had persisted in its position that Kim and Teri were not covered under the terms of the insurance policy, they could have amended their pleading to seek reformation of the insurance contract based upon the evidence of representations by St. Paul's agent that they were covered under the policy. Kim and Teri further could have used an estoppel theory to prevent St. Paul from using this defense because of these representations and its awareness that Kim and Teri were residents of the house at the time the policy was issued. Thus, there was a factual basis for this stipulation in addition to the interpretation of the policy.

 A stipulation is an agreement, admission, or concession made in a judicial proceeding by the parties relating to matters incident to the proceedings. *Peat, Marwick, Mitchell & Co. v. Sharp*, 585 S.W.2d 905 (Tex.Civ.App.—Amarillo 1979, writ ref'd n.r.e.). It is generally a voluntary agreement between opposing counsel concerning disposition of some relevant point so as to obviate the need for proof or to narrow the range of litigable issues. *See* BLACK'S LAW DICTIONARY 1269 (5th ed. 1979). The issues to be tried in an action may be limited by stipulation. *W.P. Carter & Brother v. Ruth*, 275 S.W.2d 126 (Tex. Civ.App.—Beaumont 1955, no writ). Certain issues may be excluded from consideration by stipulations. *Cherry v. Magnolia Petroleum Co.*, 24 S.W.2d 549 (Tex.Civ. App.—Beaumont 1930), *affirmed*, 45

S.W.2d 555 (Tex.Comm'n App.1932, holding approved).

 From the language of the stipulation in the present case, the parties agreed that St. Paul was "to drop as a defense its contention that the plaintiffs were not 'insureds' under the policy at the time of the loss." The stipulation goes on to state the two issues on which St. Paul would use to defend against the claim by the following language:

This stipulation is entered into by the parties for purposes of dismissal of Joffrion Insurance Agency and to define the issues at the time of trial.

 Where a stipulation limits the issues to be tried, all other issues are to be excluded from consideration. *Meeker v. Meyer*, 391 S.W.2d 787 (Tex.Civ.App.— Beaumont 1965, writ ref'd n.r.e.); *Skillern & Sons, Inc. v. Stewart*, 379 S.W.2d 687 (Tex.Civ.App.—Fort Worth 1964, writ ref'd n.r.e.). Thus, in the present case, the trial court did not err in narrowing the defenses to those stipulated by the parties.

 St. Paul stresses that at the time the stipulation was made (May 9, 1987), Kim and Teri Luker had not pleaded their bad faith cause of action. This allegation was not included in the pleadings until the Lukers filed their second amended original petition on September 1, 1989. It is true that all the intended circumstances must be considered in construing a stipulation, including the state of the pleadings. *Mann v. Fender*, 587 S.W.2d 188 (Tex.Civ.App.— Waco 1979, writ ref'd n.r.e.). The stipulation, however, was entered into again in open court before the jury at the beginning of the trial on October 2, 1989, a month after the Lukers amended their pleadings. At that point, St. Paul was well aware of the bad faith cause of action, and therefore it cannot now claim this as a basis for not honoring the stipulation. Furthermore, St. Paul never sought to withdraw or modify the stipulation and did not challenge Luker's May 9th amendment to their pleadings on the basis that the stipulation was intended to preclude such an amendment. St. Paul did, however, vigorously argue to the trial court that the stipulation was not in-

tended to admit that Kim and Teri were insureds under the policy.

St. Paul contends that the language of the stipulation is ambiguous. If there is an ambiguity in a stipulation, it is to be resolved in favor of the party in whose interest the stipulation was made and against the party conceding the stipulation. *Firestone Tire & Rubber Co. v. Chipman*, 194 S.W.2d 609 (Tex.Civ.App.— San Antonio 1946, no writ). In the present case, the language plainly sets forth the issues St. Paul wished to contest in the case. We conclude that the stipulation precluded St. Paul's contesting whether Kim and Teri Luker were insureds.

Next we look at St. Paul's contention that there was no evidence or insufficient evidence that it acted in bad faith. In reviewing no evidence points, the court considers only the evidence tending to support the finding, giving effect to all reasonable inferences therefrom, and disregarding all contrary and conflicting evidence. *Glover v. Texas General Indemnity Co.*, 619 S.W.2d 400 (Tex.1981). Insufficient evidence points require that we consider and weigh all the evidence. *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951).

St. Paul cites *National Union Fire Insurance Co.*, 780 S.W.2d 417, for the proposition that since the coverage of Kim and Teri Luker presented a case of first impression, this established the existence of a good faith legal controversy and thus justified the denial of the claim. While this legal question of first impression may have initially been a proper basis for denying this claim until this issue was litigated, it was no longer a reasonable basis for denial of the claim after St. Paul entered into a stipulation to the effect that Kim and Teri were covered under the terms of the insurance policy, as we have previously discussed.

To establish their bad faith claim, the Lukers must prove (1) the absence of a reasonable basis for denying or delaying payment of the benefits of the policy, and (2) that the carrier knew or should have known that there was not a reasonable basis for denying the claim or delaying payments of the claim. *See Aranda*, 748 S.W.2d 210, and cases cited therein. An insurance carrier maintains the right to deny invalid or questionable claims. *Aranda*, 748 S.W.2d at 213.

We shall look at the evidence in light of the information that was known or could have been known by the insurer at the time the claim was denied. There was no evidence indicating that the fire was not caused by arson, and the Lukers did not contest that issue. The Lukers took the position that they did not intentionally cause the fire. In support of that position, the Lukers offered evidence that generally in arson cases, personal belongings are removed by the occupants prior to the fire. The testimony, however, showed that nothing appeared to have been removed from the Luker house, which contained among other things, several guns belonging to Kim that were damaged by the fire. The Lukers also offered evidence that they had made significant improvements to the home and that prior to the fire, the real estate broker had a serious buyer wanting to purchase the home. They suggest that this evidence negates their having a motive to burn the house. Looking only to the evidence tending to support the jury finding and giving effect to all reasonable inferences therefrom, this amounts to some evidence that there was no reasonable basis for denying the benefits under the policy.

All the experts investigating the fire, including St. Paul's investigators, the Carthage fire marshal, and the State fire marshal, concluded that the fire had been caused by arson. There was no evidence to the contrary. The firemen reported a peculiar smell at the site of the fire which they suspected was caused by an accelerant. There were two points of fire origin with an unconnected fire having also occurred in the basement at an earlier time. Jugs of paint thinner-like substance were found in the basement. The fire marshal sent some samples from the burned-out house to his laboratory which determined that an accelerant was present. The burn patterns on the floors and baseboards suggested arson.

Next, we must look at the information which the insurance company had at the time of the denial of the claim tending to show that Kim and Teri intentionally caused the fire. There were no signs that anyone had broken into the house to set the fire, and Kim and Teri had possession of keys to the house. There was testimony that six real estate agents also had keys to the house. An unidentified person telephoned one of the firemen claiming that the Lukers were involved in the burning of the house. A statement was taken from a person who claimed to have heard Teri Luker either admitting causing the fire or stating that it would be a good thing for her and Kim if the house were to burn. Kim's ex-wife had made statements about the difficulties she was having with Kim over the house in a divorce settlement. A witness saw someone resembling Kim on the premises between 6:00 p.m. and 6:30 p.m. before the fire was started at midnight. According to the experts, the characteristics of the fire were typical of a fire set to destroy property for financial motives. There was also the circumstance of the Lukers coming within fourteen miles of their home but spending the night in another house on the night the house was burned. All this information was available to St. Paul at the time that it rejected the Luker claim.

In addition to the evidence mentioned above that the Lukers had not removed their personal belongings from the house and that the real estate broker had a serious buyer wanting to purchase the house, Kim Luker testified that he could not have been in Carthage at the time the witness saw someone resembling him on the premises because he had been in Winfield, Louisiana and would not have had time to return to Carthage. St. Paul called Kim's ex-wife and eighteen-year-old daughter to rebut his claim that he was in Winfield at 6:30 p.m. Those witnesses testified that Kim left Louisiana by 3:30 p.m. or 4:30 p.m., and other testimony showed that this would have given him ample time to have traveled to Carthage before the fire started.

As we have previously stated, the Lukers offered evidence that the insurer never interviewed Teri Luker, and they point to this as constituting evidence of a lack of a proper investigation. Pursuant to good investigative procedures, the insurer should have interviewed Teri Luker. Its investigators, however, could have assumed that as an interested party, her statement would support that of her husband. There is no showing that it would not have been consistent with her husband's statement, and because she was an interested party, it probably would not have affected the insurer's decision not to pay the claim based upon other circumstances.

As to motive, the insurer had a right to make a reasonable inference that the Lukers were interested in the proceeds from the personalty lost in the fire. Also because Kim Luker's father had purchased the house to protect the $17,000 lent to Kim to invest in the home, it can be inferred that Kim was interested in seeking his father get repaid from the proceeds from the fire insurance on the house. The Lukers point to the testimony by the real estate agent that she had a serious potential buyer for the house. This witness was asked if she had communicated this information to the Lukers, and she testified as follows:

A. Yes, I did. I told her, I do not have it in writing. I do not have an earnest money check but as soon as she brings her husband back up unless there is something he objects to, I feel that they will make a valid offer on the house.

The uncertainty of whether this buyer would actually purchase the house, including the fact that no purchase price had been agreed upon, prevents this fact from establishing that Kim and Teri had no motive to want to have the house burned.

This determination to deny the claim is not to be based on the insurer's success or failure in court on liability for the claim. The denial may be erroneous and still be in good faith if it is based upon the information which was available to the insurer at the time of the denial and which supported the denial of the claim. When

there is a bona fide controversy, the insurer has a right to have its day in court and let the jury determine each witness's truthfulness.

We find that the Lukers produced insufficient evidence to show that there was no reasonable basis for St. Paul's denial of the claim, nor did the Lukers present sufficient evidence to show that St. Paul knew or should have known that there was no reasonable basis for denying or delaying the payment of the claim.

■ To obtain exemplary damages, the Supreme Court in *Aranda* provided that such damages are recoverable for a breach of duty of good faith and fair dealing under the same principles allowing recovery of those damages in other tort actions. *Citing, Trenholm v. Ratcliff,* 646 S.W.2d 927 (Tex.1983); *Clements v. Withers,* 437 S.W.2d 818 (Tex.1969); *Ware v. Paxton,* 359 S.W.2d 897 (Tex.1962); *Bennett v. Howard,* 141 Tex. 101, 170 S.W.2d 709 (1943). The cases cited by the Supreme Court show that exemplary damages are allowed in those situations in which a defendant has displayed conduct which is willful, malicious, or shows conscious indifference. *National Fire Ins. Co. v. Valero Energy,* 777 S.W.2d 501 (Tex.App.—Corpus Christi 1989, no writ); *see also, Aetna Casualty and Surety Co. v. Joseph,* 769 S.W.2d 603 (Tex.App.—Dallas 1989, no writ). In the present case, there was no instruction or jury question concerning the state of mind of the agents of St. Paul; however, pursuant to Tex.R.Civ.P. 279, we shall presume a finding on this omitted element in support of the judgment if there is factually sufficient evidence to support this finding.

The circumstances under which St. Paul denied the claim do not give rise to an inference of conscious indifference or malice, and we find no direct evidence showing conscious indifference or malice. Therefore, we sustain St. Paul's no evidence point concerning exemplary damages.

■ Finally, St. Paul urges that the jury's finding that the fire was not intentionally caused by any act, design or procurement on the part of the Lukers was against the great weight and preponderance of the evidence. In reviewing a great weight argument, because the burden of proof was on the appellant, we must determine whether the finding of the jury was so contrary to the great weight and preponderance of the evidence as to be manifestly unjust. Calvert, *'No Evidence' and 'Insufficient Evidence' Points of Error,* 38 Tex. L.Rev. 361 (1960). We must examine all of the evidence in the record that is relevant to the fact being challenged. *Plas–Tex, Inc. v. U.S. Steel Corp.,* 772 S.W.2d 442 (Tex.1989); *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660 (1952).

■ St. Paul correctly contends that arson may be proved by circumstantial evidence because it is ordinarily conceived and executed in secrecy, *citing Garrett v. Standard Fire Ins. Co.,* 541 S.W.2d 635 (Tex.Civ.App.—Beaumont 1976, writ ref'd n.r.e.), and *Payne v. Hartford Fire Ins. Co.,* 409 S.W.2d 591 (Tex.Civ.App.—Beaumont 1966, writ ref'd n.r.e.). It also correctly states that its burden of proof at trial was not to show by an absolute certainty but rather by a preponderance of the evidence that the Lukers intentionally set the fire. *Bufkin v. Texas Farm Bureau Mutual Ins. Co.,* 658 S.W.2d 317 (Tex.App.—Tyler 1983, no writ); *Payne,* 409 S.W.2d at 595.

The Lukers did not contest the contention of St. Paul that the fire was caused by arson. They did deny having started the fire or having someone else do so. The two fire investigators hired by St. Paul and the two fire marshals believed that either Kim or Teri, or both, had set the fire. Their conclusions as to the Lukers were based in part on speculations and inferences arising from an anonymous telephone call, a statement by a witness, Everett, that he had seen a man whom he could not later identify as Kim at the scene several hours before the fire started, and statements by two other witnesses, Baker and Green, who implicated Teri.

There was evidence that the Lukers had been at the home of Teri's mother, about fourteen miles from the fire scene, on the night the fire occurred. There was no evi-

dence, however, which placed them at the scene of the fire on the night which the fire started. Although Magda Baker, former sister-in-law of Kim Luker, testified that Teri Luker had told her at a party that she (Teri) had the house burned because of problems between her and Kim, there was a suggestion during cross-examination that there may have been a personal motive for her testimony against the Lukers.

Joy Watters, a real estate broker with whom the Lukers had listed the home for sale, testified that the Lukers had made significant improvements to the home; that she told Teri shortly before the fire that she felt she had a serious buyer who wanted to purchase the home and that, although she did not at that time have a written offer, she felt that she had the house sold. This was evidence of a lack of motive by the Lukers.

The State fire marshal testified by deposition that it was routine procedure in suspected arson cases to check the home to determine if any personal belongings had been removed by the occupants prior to a fire; that he did so in the instant case, and nothing seemed to have been removed. The State fire marshal specifically noted that several guns belonging to Kim were damaged in the fire. This was evidence tending to disprove that the Lukers had set the fire. Cecil Lovett, the Carthage fire marshal, testified that he believed Kim Luker set the fire or had it set but that he could not swear that Kim did so.

A witness told the fire investigators that he had seen a person resembling Kim Luker in the garage area of the Luker home around 6:30 on the evening before the fire which started shortly after midnight. That witness could not identify Kim as the person he had seen, however. At trial, Kim testified that he dropped his son Bill off at his mother's (Kim's ex-wife) home in Winfield, Louisiana, at or about 6:30 p.m. and thus could not have been that person seen by the witness.

Kim's ex-wife and his eighteen-year-old daughter both testified that Kim had actually dropped Bill off around 3:30 p.m. or at the latest, 4:30 p.m., on that day. There was other testimony that a person could leave Winfield, Louisiana at 4:30 p.m. and be in Carthage, Texas before 6:30 p.m. This was evidence tending to show that Kim could have been the person seen by the witness at 6:30 in Carthage before the fire started.

Having previously denied contents coverage for the Lukers' personal property, and at trial having conceded that such coverage was available to them through Emmett's exercise of his policy option, the burden was on St. Paul to show by a preponderance of the evidence that Kim and Teri Luker were responsible for intentionally starting the fire and therefore should not recover their losses from the fire.

There was conflicting evidence on this issue. As the trier of fact, the jury could believe one witness and disbelieve others; resolve inconsistencies in the testimony of any witness; and accept lay testimony over that of experts. *McGalliard v. Kuhlmann,* 722 S.W.2d 694, 697 (Tex.1986). The jury verdict on such matters is generally regarded as conclusive. *Montgomery Ward & Co. v. Scharrenbeck,* 146 Tex. 153, 204 S.W.2d 508 (1947); *Clark v. National Life & Accident Ins. Co.,* 145 Tex. 575, 200 S.W.2d 820 (1947). After thoroughly considering the evidence, we find that there was sufficient evidence to support the jury's finding that the Lukers did not intentionally cause the fire and that finding was no so against the great weight and preponderance of the evidence as to be manifestly unjust.

We affirm that part of the judgment of the trial court awarding the Lukers $27,000 in damages for loss of their personal property in the fire. We reverse that part of the judgment awarding exemplary damages and render judgment against the Lukers on that issue. We also reverse that part of the judgment finding that St. Paul acted in bad faith in denying the claim for loss and awarding tort damages, and we remand that portion of the case to the trial court for a new trial.