Marie BLANKENSHIP, Appellant,

v.

ST. PAUL GUARDIAN INSURANCE, COMPANY, Appellee.

No. 12–94–00096–CV.

Court of Appeals of Texas, Tyler.

Aug. 31, 1995.

Craig M. Daugherty, Tyler, for appellant.

Russell, Schell, and John K. Vaughan, Dallas, for appellee.

HOLCOMB, Justice.

This is an appeal from a jury verdict in which the jury found that Appellant had intentionally caused the fire that destroyed her home. St. Paul Guardianship Insurance Company, Appellee, filed an action seeking declaratory judgment to determine its liability to pay the proceeds of a fire insurance policy to its insured, Marie Blankenship. Blankenship filed a counter-claim against the Insurance Company for breach of contract for failing to pay the policy proceeds. In her first point of error, Blankenship challenges the factual sufficiency of the evidence to support the verdict. In her second point of error, Blankenship contends that the court erred when it submitted an issue to the jury that was not a correct statement of the law. We will affirm.

In her first point of error, Blankenship argues that the jury's finding that she set the fire or caused it to be set was overwhelmingly against the evidence. In reviewing factual sufficiency points of error, the appellate court must examine all of the evidence in the record, including any evidence contrary to the judgment to determine if the challenged finding is so against the great weight and preponderance of the evidence as to be clearly wrong or unjust. *Plas–Tex. Inc. v. United States Steel Corp.*, 772 S.W.2d 442, 445 (Tex.1989); *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951). To establish arson as a defense to a civil suit for insurance proceeds, the insurance company must show by a preponderance of the evidence that the insured set the fire or caused the fire to be set. *St. Paul Guardian Ins. Co. v. Luker*, 801 S.W.2d 614 (Tex.App.—Texarkana 1990, no writ.); *State Farm Lloyds Inc. v. Polasek*, 847 S.W.2d 279 (Tex. App.—San Antonio 1992, writ den'd).

Blankenship's house in Fruitvale was located on 40 acres of land and was built by Butch

Dugan in 1980. Charles Parker bought the house from Dugan and then sold the house to Blankenship for $129,469.35 in February of 1988. Initially, Blankenship entered into a temporary residential lease with the Parkers. She agreed to pay $2,000 per month. The monthly lease payments would be applied to an agreed cash down payment in the amount of $25,000, which would leave a balance of approximately $105,000 to be financed when the purchase of the house closed in September. In accordance with her lease, Blankenship insured the replacement value of the house for $200,000 and insured the contents for $120,000. When Blankenship moved into this house, her house in Oklahoma had not sold.

On the night of July 28, 1988, the house in Fruitvale burned. It is undisputed that the fire was intentionally set. Allegedly, Blankenship was not home at the time that the fire was started. She testified that she was with Linda Smith, Charles Parker's sister, during that time. According to Blankenship's alibi, she left her home to meet Smith at 2:00 P.M. on the day of the fire. Blankenship stated that they spent the rest of the afternoon running errands and swimming. After swimming, Blankenship and Smith went to Tyler to eat. Although they had not planned to stay out late that evening, they ended up staying out until approximately 1:30 A.M. When Blankenship returned to her home, she found that the house was engulfed in flames.

The first one at the scene of the fire was Gerald Sizemore. Sizemore was the fire chief for the Fruitvale Volunteer Department. Sizemore testified that he had occasion to pass by the Blankenship residence two or three times a week prior to the fire and was familiar with the location. Although the Blankenship property had a gate to the entrance, Sizemore had never seen the gate closed. However, on the night of the fire, the gate was both closed and locked causing Sizemore to use bolt cutters to cut the lock. A few minutes after Sizemore's arrival, the Edgewood Fire truck arrived and attempted to suppress the fire.

Sizemore was present when Blankenship arrived at the scene. He testified that Blankenship got out of her car, put her hands up to her face and fell to the ground, "just like she had passed out." Sizemore was a certified emergency technician and went to provide medical assistance to Blankenship. After examining Blankenship, Sizemore determined that her pulse rate was normal and that she was breathing. He attempted to look into her eyes, but Blankenship was "holding her eyes closed," which led Sizemore to believe that Blankenship had not really passed out. After approximately three minutes, Blankenship got up and walked around as if nothing had happened.

Ronald Rasberry, a independent adjuster/appraiser for East Texas Claims Service in Tyler, testified that he came to the scene two days after the fire and sifted through the debris for six hours. Rasberry was hired by the Insurance Company to inspect the scene and to ascertain the extent of loss of the personal property. Rasberry explained that items with metal content, such as drawer pulls, small appliances, and electric motors, typically survive the blaze.

In his report, Rasberry listed the items that he identified in each room of the house. After he completed his inventory, he was given a copy of the sworn proof of loss inventory that Blankenship had given to the Insurance Company. The items that Rasberry identified in the debris were checked with a "red" check. There was a significant discrepancy between Blankenship's inventory and Rasberry's inventory. For instance, in the kitchen, Blankenship listed approximately 53 items of kitchen ware, appliances and dishes: Rasberry identified 8 items. In the living room, Blankenship listed approximately 33 items, including over $8,000 of new living room furniture: Rasberry found 6 items. Out of approximately 35 items listed by Blankenship to be in the bedroom, Rasberry found 6 items. In the garage, Rasberry identified a hammer, a bicycle, a rake, a shovel, and a post-hole digger in the debris. Blankenship listed 79 items including a band saw, circular saws and saw blades.

In addition, Rasberry took pictures of the refrigerator, washing machine and dryer that he found in the debris. Upon comparing the pictures of the new appliances that Blankenship submitted in her proof of loss with the

major appliances found in the debris, Rasberry was able to determine that these new appliances were not the same appliances that he found. Blankenship later admitted at trial that the new appliances that she had claimed on the sworn proof of loss were actually in her home in Oklahoma.

Tom West conducted the origin and cause investigation of the fire for the Insurance Company. During his investigation, West observed burn patterns on the concrete, which indicated to him that concentrated areas had burned at extreme temperatures. He also found propane tanks in various rooms of the house. Other than concluding that the fire was set intentionally, West also concluded that the person who started the fire was "amateurish." West estimated that 5–10 gallons of gasoline had been used to accelerate the fire; therefore, the person who set the fire went to a lot of effort to make sure that the home was destroyed. During West's investigation, he obtained samples of the debris and sent them to the forensic lab for evaluation. Dr. Andrew Armstrong, a chemist, testified that out of the eight samples that he had analyzed, five of the samples positively identified gasoline.

Sally Yarbrough, Blankenship's next door neighbor, also testified. Yarbrough had been in Blankenship's house prior to the fire. Although Blankenship's proof of loss indicated that her house was well-furnished with new furniture, Yarbrough testified that the house was sparsely furnished and that Blankenship did not have pictures on the walls. According to Yarbrough, Blankenship's home appeared to be a "vacation home" and Blankenship was considered "a temporary" in the neighborhood.

Yarbrough admitted that she was somewhat of a "snoop." She did not work outside the home, and typically spent her day on her front porch or her balcony watching people as they passed. Yarbrough testified that she saw a Mayflower moving van leaving the Blankenship residence two or three days before the fire.

Evidence of Blankenship's financial condition at the time of the fire was conflicting. The Insurance Company presented evidence to support its theory that Blankenship's had

significant financial difficulties. Ken Miller, a certified public accountant, testified that he had reviewed Blankenship's bank records, credit applications, federal income tax returns and the transcripts of Blankenship's sworn testimony. After reviewing these records, Miller concluded that Blankenship had a negative cash flow of approximately $3,000 every month.

Blankenship challenged Miller's findings and testified that she had forgotten to tell the Insurance Company in her sworn testimony that she had several other sources of income. She offered a summary of her bank account into evidence from the period of January to September 1988, which revealed a positive cash flow of $17,300.

However, Blankenship's candor about her financial condition varied with each statement that she made. Blankenship admitted to the jury that she had falsely told the Insurance Company that, in addition to owing the $105,000 balance on the house note, she owed another "side" note in the amount of $55,000 to her friend, John Hodge. She admitted that this fabricated "side" note was an effort to elevate her reimbursement of insurance proceeds closer to the $200,000 insurance policy limits. She stated, "I thought it was the only way to protect what investment I had at that time, and I was frightened; I was mixed up."

Blankenship also admitted that she had falsely given a sworn statement to the Insurance Company representing that she was receiving $750 per month rent from Dr. George Sakalosky for her Oklahoma home. At trial, the Insurance Company played a video taped deposition of Dr. George Sakalosky in Gatlinburg, Tennessee in which he denied that he rented the Oklahoma property from Blankenship. At trial, Blankenship admitted that she had lied about the lease with Dr. Sakalosky in an effort to "make [herself] look better" to the Insurance Company.

Blankenship admitted that she also did not tell the truth to the Insurance Company when she stated under oath that she had sold another piece of Oklahoma property to Billy Mullins for $125,000. Blankenship testified that Mullins actually bought the property for

$75,000. However, Blankenship told her accountant that she sold the property to Mullins for $75,000 instead of $125,000, "because [she] didn't want to pay the capital gains on it."

Mullins testified that in March 1989, she was subpoenaed by the Insurance Company to have her deposition taken. Prior to her deposition, Blankenship's friend, John Hodge, contacted Mullins and asked her to testify "that [she] paid Blankenship $125,000 for the Oklahoma property," but Mullins refused to lie under oath about the amount of money that she had paid Blankenship.

After Blankenship continued to admit that she had not been truthful in various sworn statements, the trial court recessed to afford Blankenship's attorney an opportunity to explain to his client that her testimony may have criminal consequences. The court also advised Blankenship of her rights under the TEXAS and UNITED STATES CONSTITUTIONS and stated that if Blankenship continued to testify falsely she could be charged with aggravated perjury.

As to any motive that she might have to burn the house, Blankenship admitted that she would profit from the fire, but argues that Charles Parker would have been the person that would most likely benefit from the loss. In an effort to prove that Charles Parker was responsible for setting the fire, Blankenship points to the testimony of Butch Dugan, the builder of the house and Charles Parker's close friend. Dugan admitted that he had spent 30 days in jail for burning a car for a friend who needed the insurance money. He stated that Charles Parker had asked him to burn the Blankenship house, but he refused to do it. He also stated that a few weeks before the fire, Parker told him that Parker was going to "take care of it," meaning to Dugan that Parker was going to have the house destroyed. However, Dugan admitted that his testimony at trial was a different story than Dugan had previously given in a deposition. He also admitted that he had been with Blankenship and Parker at Parker's house a few days after the fire.

■ Blankenship argues that the Insurance Company had "absolutely no evidence that Blankenship had the opportunity to set the fire" nor did it have any evidence that she was involved in a conspiracy to burn the house. She held to her alibi that she was with Linda Smith, Charles Parker's sister, at the time that the fire occurred; therefore, she argues that she did not have an opportunity to set the fire. She reasons that, without any facts or circumstances to indicate opportunity or motive, it is clear that the jury's decision was the result of prejudice against Blankenship. However, Blankenship overlooks the basic principle that the jury's responsibility is to resolve conflicts and inconsistencies in the evidence. *Wilbanks v. Wilbanks*, 160 Tex. 317, 330 S.W.2d 607, 609 (1960). The jury is charged with judging the credibility of the witnesses and is given great latitude in believing or disbelieving the testimony of any witness. *Calvin V. Koltermann, Inc. v. Underream Piling Co.*, 563 S.W.2d 950 (Tex.Civ.App.—San Antonio 1977, writ ref'd n.r.e.). The jury is entitled to disbelieve a witness even though that witness is neither impeached nor contradicted. *Blackmon v. Piggly Wiggly*, 485 S.W.2d 381, 383 (Tex.Civ.App.—Waco 1972, writ ref'd n.r.e.). Therefore, the trier of fact may believe all, part, or none of the evidence. *Id.* Although the evidence is void of eyewitness testimony to support the jury findings that Blankenship set the fire or cause it to be set, arson is a crime that is conceived and executed in secrecy to avoid detection and exposure. *See Luker*, 801 S.W.2d at 622. By its very nature, the jury is typically in a situation to make findings based upon circumstantial evidence. *See Garrett v. Standard Ins. Co. of Hartford, Conn.*, 541 S.W.2d 635 (Tex. Civ.App.—Beaumont 1976, writ ref'd n.r.e.). Blankenship's credibility was a key factor in this case. After reviewing the entire record, we hold that the evidence was factually sufficient to support the jury's finding that the fire was intentionally set and that Blankenship had an opportunity and motive to set it. Point one is overruled.

■ In her second point of error, Blankenship contends that the court erred when it submitted an issue that was not a correct statement of the law. The trial court submitted the following issue to the jury: "Do you find from a preponderance of the evidence

that Marie Blankenship, or someone acting within her knowledge, or someone acting on her behalf, intentionally caused the fire which occurred at her house near Fruitvale, Texas on or about July 28, 1988?" Blankenship objected to the language "or someone acting within her knowledge" because it was not a correct statement of Texas law and it was a comment on the weight of the evidence. The trial court overruled Blankenship's objection.

Blankenship refers us to numerous cases in which the courts have submitted an issue to the jury that read: "Do you find from a preponderance of the evidence that the fire in question was intentionally caused by any act, design or procurement on the part of the Plaintiff." *See Lundy v. Allstate Insurance Company,* 774 S.W.2d 352, 355 (Tex.1989). Blankenship argues that theoretically, she "could have knowledge that someone was going to burn her house without being culpable." She also argues that such a phrase was harmful to Blankenship because it allowed the jury to find against Blankenship if the jury believed that Blankenship just knew that someone was going to set fire to her house.

Although we are unable to find precedent in the case law for the submission of an issue that includes the possibility that the fire was caused with the knowledge of the insured, we do not see the manner in which Blankenship was harmed by the submission of the issue. At trial, she stated unequivocally that she did not know anyone "on the planet earth" who had reason to set the fire. She denied that the house had been the subject of prior burglaries, or vandalism and denied that anyone had threatened to have the premises burned. Therefore, even though the court allowed the issue to the submitted to the jury which was broader than the issues that have been submitted in other cases, we hold that Blankenship was not harmed by the submission of the issue. Point two is overruled.

The judgment of the trial court is **affirmed.**