**HURD ENTERPRISES, LTD., Killam & Hurd, Ltd., & Killam and Hurd, Appellants,**

**v.**

**Fred M. BRUNI, Ernest M. Bruni & Ernesto Ramirez as Trustees of the Bruni Mineral Trust No. 2, Appellees.**

No. 04–90–00330–CV.

Court of Appeals of Texas, San Antonio.

Feb. 12, 1992.

Rehearing Denied April 14, 1992.

Richard N. Hansen, Law Offices of Richard N. Hansen, Laredo, Bertrand C. Moser, Paul Herrmann, William Pannill, Pannill & Moser, Houston, Emilio Davila, Jr., Laredo, William C. Denton, Conoco, Inc., William M. Sutton, Exxon Co., U.S.A., Michael L. Homeyer, Amoco Corp., Everard A. Marseglia, Jr., JoAnn P. Russell, Butler & Binion, Houston, for appellants.

Steve A. Whitworth, Donato Ramos, George J. Person, Person, Whitworth, Ramos, Borchers & Morales, Laredo, for appellees.

Before REEVES, C.J., and BUTTS and BIERY, JJ.

## OPINION

BIERY, Justice.

This is an appeal from a jury verdict and judgment thereon in a suit to recover royalty on a take-or-pay settlement and damages for breach of an asserted duty of good faith and fair dealing. We reverse and render judgment that the appellees take nothing on their claims.

In 1974, the trustees of the Bruni Mineral Trust[1] (Bruni) entered into an oil and gas lease with Killam & Hurd, Ltd.[2] The net effect of the lease was that Bruni conveyed all of the oil and gas estate to Killam & Hurd, Ltd. Killam and Hurd took on the risk and expense of exploration and drilling; Bruni was to receive a one-eighth royalty if, as, and when oil and gas was produced. Nine producing gas wells were completed on the lease premises, and gas production from two of the wells was marketed under a gas purchase contract between Killam & Hurd, Ltd. and United Texas Transmission Company (UTTCO). The gas purchase contract provided for a 15–year term and included a take-or-pay

---

1. The lease was executed by the Bruni Mineral Trust $ 1, Bruni's predecessor, and the lease covered 3,808 acres in Webb County.

2. In 1981, Killam & Hurd, Ltd. dissolved and became a partnership known as Killam and Hurd. The partnership later split into two separate companies, Hurd Enterprises, Ltd. and Killam Oil Company. Each company acquired a one-half interest in the lease and in the gas purchase contract entered into with United Texas Transmission Company.

provision.[3] Shortly after the gas contract was signed, the gas market collapsed and by 1984, UTTCO was buying only five to ten percent of the contract amount and refused to pay for the gas not taken. Hurd could not sell the gas elsewhere because the contract contained a dedication clause; therefore, Hurd strived to obtain marketing concessions from UTTCO. The contract was amended in January of 1986 to lower the contract price gradually, and a second amendment was made at the end of 1986, to allow either party to change the price of the gas by giving 30 days' notice. Hurd's next mission was to obtain a release of the dedication clause so it could market the gas elsewhere. The release was obtained and in exchange, UTTCO received a volume credit under the contract for gas sold to others. Hurd was still in a predicament because the only pipeline available to transport the gas to other markets was owned by UTTCO which demanded a high transportation fee. In response, Hurd invested $1.5 million in a pipeline to compete with UTTCO, and UTTCO reduced its transportation rate by 17 cents per Mcf.[4]

In the meantime, the owner of the other fifty percent interest, Killam Oil Company, sued UTTCO for take-or-pay deficiencies arising under the gas purchase contract. A cash settlement was reached, and Killam dismissed its suit. Hurd negotiated a settlement with UTTCO without filing suit, and Hurd released UTTCO from all prior claims under their 1981 contract for take-or-pay deficiencies and agreed to cancel the contract. At the request of UTTCO, the settlement agreements were to be kept confidential; however, Bruni learned of the Killam settlement and made demand for its royalty share. When Killam refused the Bruni demand, Bruni filed suit against Killam. Hurd was later added as a defendant when Bruni learned of Hurd's settlement with UTTCO during the course of the Killam discovery.

Cross motions for summary judgment were filed. The trial court concluded as a matter of law that the gas royalty clause was applicable to the settlement payments and rendered judgment for Bruni. The trial court severed the royalty claim, and Killam and Hurd appealed the partial summary judgment to this Court. The remaining issues were tried before a jury[5] and the following verdict was rendered:

1.  Bruni was entitled to $98,048 as its share of the royalty interest of the settlement that Hurd obtained from UTTCO.

2.  Hurd did not fail to reasonably market the gas by (a) agreeing to the two contract amendments and (b) settling the contract claims as it did.

3.  A confidential relationship existed between Hurd Enterprises, Ltd. and the Bruni Mineral Trust.

4.  Hurd did not breach its duty of good faith and fair dealing in regard to its marketing obligations by agreeing to the two contract amendments but *did* breach its duty of good faith and fair dealing by settling the contract claims as it did.

3.  The take-or-pay provision required UTTCO to take 85% of the deliverability of the wells each year or to pay for any amount less than 85% it did not take. UTTCO had five years following a deficiency to recoup gas not taken in earlier years. The contract provided for the maximum lawful price with periodic price escalations and also contained a dedication clause which prohibited the seller from disposing of the gas to any other buyer.

    The purpose of the take-or-pay provision is to give the producer a continuous, stable, and assured source of revenue to cover the fixed charges such as service on its indebtedness, maintenance costs, and its initial capital investment. ERNEST E. SMITH & JACQUELINE LANG WEAVER, TEXAS LAW OF OIL AND

GAS Vol. 1, § 4.6(E)(6) p. 211 (Issue 2, Butterworth 1991) (citing *Diamond Shamrock Exploration Co. v. Hodel,* 853 F.2d 1159 (5th Cir. 1988)).

4.  Mcf is defined as a thousand cubic feet. It is the standard unit for measuring natural gas volume. HOWARD R. WILLIAMS & CHARLES J. MEYERS, OIL AND GAS TERMS 552 (7th ed. 1987).

5.  The week before trial, Killam Oil Company settled all claims with Bruni except the claim that Killam owed Bruni royalty on the Killam–UTTCO settlement. Killam did not participate in the trial and is not a party to the appeal.

5. The breach was a proximate cause of the damages sustained by Bruni in the amount of $183,926.

6. Bruni was not entitled to punitive damages.

7. Bruni was entitled to attorney's fees in the amount of $198,000 for trial and $25,000 for appeal in its claim against Hurd for its royalty share of the UTT-CO settlement.

After the final judgment was entered, this Court issued its opinion on the previously severed motion for summary judgment concerning the royalty. We held, as a matter of law, that Bruni was not "entitled to royalties on the settlement proceeds arising from the take-or-pay provision of the contract between Killam, Hurd, and UTTCO." *Killam Oil Co. v. Bruni*, 806 S.W.2d 264, 268 (Tex.App.—San Antonio 1991, writ denied). The summary judgment granted in favor of Bruni was reversed, and judgment was rendered in favor of Killam Oil and Hurd Enterprises. Hurd brought its appeal from the jury trial, and oral argument was heard prior to the supreme court denying writ on the first Bruni decision. In its appeal, Hurd asserts three points of error contending the court erred in granting Bruni judgment because: (1) there is no duty of good faith and fair dealing in a lessor-lessee case, and there is no evidence to support the verdict; (2) Bruni is not entitled to share in the take-or-pay settlement because a royalty owner is not entitled to share in the settlement; and (3) Bruni is not entitled to attorney's fees because Hurd has no contractual liability.

■ In the second point of error, Hurd contends the trial court erred in granting Bruni judgment for royalty on Hurd's settlement with UTTCO because a royalty owner is not entitled to share in a take-or-pay settlement. Hurd requests that we reverse, as a matter of law, that portion of the judgment awarding $98,048 in royalty

to Bruni because in the first appeal, this Court has already ruled that Hurd owes no royalty to Bruni.

In response to Hurd's argument, Bruni argues that although the settlement was labeled as a "take-or-pay settlement," the experts testified at trial that the settlement was not a take-or-pay settlement because there was no right of recoupment.[6] The jury, however, was not asked to determine whether the settlement was in fact a "take-or-pay" settlement but rather, based on the district court's ruling on the partial summary judgment that Bruni was entitled to royalty, was simply asked what amount Bruni's royalty share should be. Bruni also asks that we consider the arguments that it made in its Application for Writ of Error to the Texas Supreme Court. In addition, after oral argument in this case, Bruni filed a supplemental brief with this Court requesting that we reconsider our ruling on the royalty issue because the Fifth Circuit Court of Appeals reversed the district court in *Frey v. Amoco*, 708 F.Supp. 783 (E.D.La.1989), and allowed the royalty owners to share in the take-or-pay settlement. *Frey v. Amoco Prod. Co.*, 943 F.2d 578 (5th Cir.1991). Bruni urges us to consider this decision and likewise find that it is entitled to its proportionate share of the settlement monies paid to Hurd.

The 5th Circuit Court in *Frey* distinguishes its previous decision in *Diamond Shamrock Exploration Co. v. Hodel*, 853 F.2d 1159 (5th Cir.1988), which did not allow royalty owners to share in the settlement and which is cited by this Court in the first Bruni decision, in three ways: (1) the cases concern different lease language; (2) federal law was applied in the *Diamond Shamrock* decision but the *Frey* decision was based on Louisiana law; and (3) the lessor wrote the lease in *Diamond Shamrock* whereas the lessee prepared the lease and presented it to the lessor for execution

---

**6.** Bruni raised the argument that if in the settlement between the producer and the pipeline, the right of recoupment is relinquished, this has the effect of increasing the price paid for gas produced in the past. The Federal Energy Regulatory Commission has rejected this rationale by ruling that "non-recoupable payments from

gas purchasers to producers for revisions or waivers of take-or-pay obligations are *not* purchase payments for gas." Walter Cardwell, *Do Producers Owe Royalty on Take-Or-Pay Settlements?*, in STATE BAR OF TEXAS, ADVANCED OIL, GAS AND MINERAL LAW COURSE S–18 (1991).

in *Frey*. Bruni contends that the *Frey* decision should be controlling because the lease language in *Frey* is the same as in the lease at issue here. Subsequently, on January 8, 1992, the Fifth Circuit in *Frey*, granted Amoco's petition for rehearing and certified the take-or-pay royalty issue to the Louisiana Supreme Court because of its "tremendous consequences for Louisiana's gas industry and its citizens who own mineral interests in Louisiana real estate." *Frey v. Amoco Prod. Co.*, 951 F.2d 67 (5th Cir.1992).

In *Frey*, the language concerning royalty read that "the royalty on gas sold by Lessee to be one-fifth (⅕) of the amount realized at the well from such sales." The court stated that the lease provides for royalty on the amount realized from sales, *not on production,* and in Louisiana, a "sale is sometimes made of a thing to come: as of what shall accrue from an estate, of animals yet unborn, or such like other things, although not yet existing." (Emphasis added.) The court cites to *Diamond Shamrock* and this Court's first decision in *Bruni* by using a comparison signal which is used when the cited authority supports a proposition different from the main proposition but sufficiently analogous to lend support. The court further stated that the fact that "the Lease explicitly bases oil and miscellaneous mineral—but not gas—royalties on *production* strongly suggests that we *not* interpret *production* to be a prerequisite to royalties on *gas.*"

7. "The 'law of the case' doctrine is defined as that principle under which questions of law decided on appeal to a court of last resort will govern the case throughout its subsequent stages." *Hudson,* 711 S.W.2d at 630.

8. We recognize there are cogent arguments concerning the royalty owner's interest in take-or-pay settlement funds, especially when, as here, the settlement terminates the purchaser's recoupment rights. One argument asserts that "if the gas purchase contract entitles the producer to retain take-or-pay proceeds, even though the pipeline never makes up the gas paid for, such proceeds have had the practical effect of increasing the price paid for gas actually produced. The lessor should be entitled to a royalty on these proceeds once the make-up right has terminated." ERNEST E. SMITH & JACQUELINE

(Emphasis added.) In the Bruni lease, the royalty clause in the lease is as follows:

> The royalties to be paid by lessee are ... (b) on gas, including casinghead gas and all gaseous substances, *produced* from said land *and sold* or used off the premises or in the manufacture of gasoline or other product therefrom, the market value at the mouth of the well of one-eight of the gas so sold or used provided that on gas sold at the wells the royalty shall be one-eighth of the amount realized from such sale.... (Emphasis added.)

In the first *Bruni* decision, we clearly stated that under Texas law, the term "production" in oil and gas leases means the actual physical extraction of the mineral from the soil. *Killam Oil Co. v. Bruni,* 806 S.W.2d 264, 267 (Tex.App.—San Antonio 1991, writ denied). In addition, we also stated in the first *Bruni* decision that "[t]he Trust, as *drafters* of the lease, could have specifically included a provision allowing for royalties to be paid upon proceeds received by Killam and Hurd from settlements of disputes arising from a breach of take-or-pay provision in gas contracts," and in fact, the present lease form used by the Trust does contain such a provision. *Id.* at 267–68 & n. 3.

■ In view of this Court's first opinion, the fact that the Texas Supreme Court denied writ of error, and the distinguishing factors between the Bruni lease and the lease at issue in *Frey*, we apply the "law of the case" doctrine [7] and sustain the second point of error. *Hudson v. Wakefield,* 711 S.W.2d 628, 630 (Tex.1986).[8]

LANG WEAVER, TEXAS LAW OF OIL AND GAS Vol. 1, § 4.6(E)(6) p. 215 (Issue 2, Butterworth 1991). In addition, "[i]f the settlement terminates the pipeline's right to make-up gas not taken during the period covered by the settlement, the royalty owner will have no later opportunity to claim part of the settlement as gas is produced. Indeed, once the gas is produced, it may well be sold under a new contract which establishes a price significantly lower than the price provided for in the disputed take or pay clause." *Id.* at 215-0. A similar argument claims that "[a]ssuming that the [take-or-pay] payment extinguishes the pipeline's make-up right with respect to gas not taken in the prior period, as is the usual case, the royalty owner has no subsequent opportunity to receive a share of the lump sum payment. Nor is the paid for but unproduced gas likely to be produc-

In its first point of error, Hurd contends that the court erred in granting Bruni judgment for the breach of the duty of good faith and fair dealing because there is no such duty in a lessor-lessee relationship, and there is no evidence to support the finding of a confidential relationship. Bruni responds that it is not the lessor-lessee relationship itself but the special relationship that arises because of the nature of the marketing of gas and the unequal bargaining position of the parties which mandates that the jury consider whether a confidential or special relationship exists giving rise to the duty of good faith and fair dealing.

The jury found that a confidential relationship existed between Hurd and the Bruni Trust and also found that Hurd breached its duty of good faith and fair dealing only with respect to its marketing obligations to the Trust by settling the November 24, 1981, contract claims in the manner it did. The jury did *not* find, however, that Hurd breached its duty to reasonably market the gas by settling the contract claims.

The Bruni Trust asks this court to uphold the jury's findings and impose a duty of good faith and fair dealing on Hurd based upon its settlement with UTTCO of their contract dispute. Bruni contends the evidence presented at trial showed the existence of a confidential relationship between the parties and an imbalance of bargaining power which allowed the court to impose a duty of good faith and fair dealing in this case. We disagree.

■ In the context of oil and gas contracts, the relationship between a lessor and a lessee has been held to be purely contractual absent some other special relationship between the parties. *Cambridge Oil Co. v. Huggins*, 765 S.W.2d 540, 544 (Tex.App.—Corpus Christi 1989, writ denied). A unity of interest arises as a result of the lessor/lessee relationship because the parties derive mutual economic benefits from the gas production. Frank Douglass, *Tort Liability Between Lessors and Lessees—The Duty of Good Faith and Fair Dealing (If Any), Punitive Damages, Royalty Owner Exposure*, in STATE BAR OF TEXAS ADVANCED OIL, GAS AND MINERAL LAW COURSE I-2 (1991). It is also recognized that the parties' interests will conflict in matters of maintaining production, marketing the product, treating, testing, and reworking wells, and in appearing before administrative bodies.[9] *Id.* The protection for the lessor arises out of the lease agreement and is provided through the use of express covenants, like the duty to pay royalty, and through implied covenants which arise by virtue of the lessor/lessee relationship. *Id.* The implied covenants require the lessee to: (1) reasonably develop the premises, (2) protect the leasehold, and (3) manage and administer the lease. *Cabot Corp. v. Brown*, 754 S.W.2d 104, 106 (Tex.1987). The covenant to manage and administer the lease includes the duty to reasonably market the oil and gas produced from the premises. Under the duty to reasonably market, the

---

ed and sold under a subsequent contract at a price nearly as high as the original contract price." Frank Douglass, *Tort Liability Between Lessors and Lessees—The Duty of Good Faith and Fair Dealing (If Any), Punitive Damages, Royalty Owner Exposure*, in STATE BAR OF TEXAS, ADVANCED OIL, GAS AND MINERAL LAW COURSE I-10 (1991) (citing Pierce, *Lessor/Lessee Relations in a Turbulent Gas Market*, 38 Oil & Gas Inst. sec. 1, 19–20 (Matthew Bender 1988)). "The legal issue is whether the nonrecoupable take-or-pay payment is compensation for past and/or future gas production, or whether it represents payment for the producer having the gas available but not producing it, i.e. storing the gas for the purchaser's benefit." *Id.* The recoupment issue, however, was not submitted in the case before us. Therefore, we are persuaded that current Texas precedent,

which we are bound to follow, the drafting of the particular lease language by the appellees, and the procedural posture of the case require us to leave in place our earlier ruling.

9. "For example, an eager lessor's interests are fulfilled when the lessee undertakes expensive operations to improve or maintain production. Yet, a cautious lessee will commit itself to an expensive course of action only after receiving some reasonable assurance of a compensating increase in its share of production and proceeds therefrom." Frank Douglass, *Tort Liability Between Lessors and Lessees—The Duty of Good Faith and Fair Dealing (If Any), Punitive Damages, Royalty Owner Exposure*, in STATE BAR OF TEXAS ADVANCED OIL, GAS AND MINERAL LAW COURSE I-2 (1991).

lessee is required to market the production with due diligence and obtain the best price reasonably possible. *Id.* The standard applied to test the performance of the lessee in the marketing of the gas is that of "a reasonably prudent operator under the same or similar circumstances." *Id.* The jury did apply this standard with respect to Hurd's marketing duty and found Hurd did not breach its implied duty. However, instead of ending the inquiry at that juncture, the jury was asked if a confidential relationship existed and if so, whether Hurd breached its duty of good faith and fair dealing.

■ Bruni asserts that the supreme court in *Texas Oil & Gas Corp. v. Hagen*, 31 Tex.Sup.Ct.J. 140, 1987 WL 47847 (Dec. 16, 1987), *opinion withdrawn, case settled*, 760 S.W.2d 960 (Tex.1988), made it clear that a necessary prerequisite for recovery under the duty of good faith and fair dealing is a finding of a special relationship or a finding of an inherent imbalance of bargaining power between the parties. However, in *Hagen* the court stated that the standard of care, which the marketing duty traditionally carries, is the "prudent operator standard." *Hagen*, 31 Tex.Sup.Ct.J. at 141. The court quoted from a previous opinion which defined the standard of care as follows:

> The standard of care in testing the performance of implied covenants by lessees is that of a reasonably prudent operator under the same or similar facts and circumstances.... Every claim of improper operation by a lessor against a lessee should be tested against the general duty of the lessee to conduct operations as a reasonably prudent operator in order to carry out the purpose of the oil and gas lease. (quoting *Amoco Production Co. v. Alexander*, 622 S.W.2d 563 (Tex.1981).

*Id.*

The court further stated it had never advocated a fiduciary or "highest good faith" or "utmost good faith" standard in any oil and gas implied covenant case. "[U]nless the lease document itself creates in law a trust, or unless a relationship of trust and confidence necessarily results from the lessor-lessee relationship, the standard of conduct of the lessee cannot be appropriately categorized as fiduciary." *Id.* at 142; *see Cabot Corp. v. Brown*, 754 S.W.2d 104, 106 (Tex.1987) (standard of care to test performance of lessee in marketing gas is that of a reasonably prudent operator under same or similar circumstances). Bruni relies on the decisions in *LeCuno Oil Co. v. Smith*, 306 S.W.2d 190 (Tex.Civ.App.—Texarkana 1957, writ ref'd n.r.e), *cert. denied*, 356 U.S. 974, 78 S.Ct. 1137, 2 L.Ed.2d 1147 (1958), and *Amoco Prod. Co. v. First Baptist Church*, 579 S.W.2d 280 (Tex.Civ.App.—El Paso 1979), *writ ref'd n.r.e.*, 611 S.W.2d 610 (Tex.1980), to support its claim of a higher good faith standard than that imposed by the reasonably prudent operator standard.

In *LeCuno Oil*, the court did require that LeCuno exercise the highest good faith in any contract it entered into with regard to the royalty owner's gas. However, the court immediately pointed out that the relationship between the parties in that case was distinguishable from that found in most cases because LeCuno was both lessee and pipeline owner, a situation not present in the case before us. In *Amoco v. First Baptist Church*, the issue was whether there was a duty or implied covenant to market the gas at any particular price, particularly when the lease provided for royalty based on the amount realized from the sale. The evidence indicated that about twenty months after the well began producing gas, Amoco committed and dedicated the gas to long-term contracts on terms approximately one-half of the amount at which gas was then being sold to other purchasers from the same well and with no right of future price redetermination based on market increases. *Amoco v. First Baptist Church*, 579 S.W.2d at 284. Additionally, Amoco obtained for itself extra benefits in respect to other properties in which the appellees had no interest. The court focused on the duty owed with respect to obtaining the highest price reason-

ably obtainable.[10] In the case before us, the jury found that Hurd did obtain the highest price reasonably possible. In addition, the supreme court in *Hagen* disapproved of the *Amoco v. First Baptist Church* decision. *Texas Oil & Gas Corp. v. Hagen*, 31 TEX.SUP.CT.J. 140, 142 n. 2, 1987 WL 47847 (Dec. 16, 1987).[11] Furthermore, it has also been argued by many commentators, that no sound reason exists for distinguishing the duty owed in marketing cases from other implied covenant cases because the "reasonably prudent operator standard is sufficiently flexible to permit a gas producer to use its judgment in choosing the better alternative." ERNEST E. SMITH & JACQUELINE LANG WEAVER, TEXAS LAW OF OIL AND GAS Vol. 1, § 5.4(b)(1) p. 279 (Issue 2, Butterworth 1991). However, Bruni also asserts that as to the duty of good faith and fair dealing, the jury finding is dispositive and in addition, the imbalance of the bargaining power between Bruni and Hurd is analogous to that found in the insurance context where a duty of good faith and fair dealing is applied.

In support of its insurance analogy, Bruni relies on the decisions of the supreme court in *Arnold v. National County Mut. Fire Ins. Co.*, 725 S.W.2d 165 (Tex.1988), and *Aranda v. Insurance Co. of North America*, 748 S.W.2d 210 (Tex.1988), wherein the court found a special relationship to exist because of the parties unequal bargaining power and the nature of insurance contracts. In *Arnold*, a special relationship arising out of an insurance policy was found because of:

the parties' unequal bargaining power and the nature of insurance contracts which would allow unscrupulous insurers to take advantage of their insureds' misfortunes in bargaining for settlement or resolution of claims. In addition, without such a cause of action insurers can arbitrarily deny coverage and delay payment of a claim with no more penalty than interest on the amount owed. An insurance company has exclusive control over the evaluation, processing and denial of claims.

*Arnold*, 725 S.W.2d at 167. However, a "special relationship" cause of action in tort for breach of the duty of good faith and fair dealing was not extended to ordinary commercial contractual relationships such as the supplier-distributor relationship. *Adolph Coors Co. v. Rodriguez*, 780 S.W.2d 477, 481 (Tex.App.—Corpus Christi 1989, writ denied). The court stated that the nature of the supplier-distributor relationship did not require special protection nor did the supplier have the same exclusive control over the distributor's business that the insurer had over the insured's claim. *Id.*

Likewise in the oil and gas lease context, the lessee does not have the exclusive control over the lessor as is found in the insurance contract. A lessee is not an agent with respect to the sale of the lessor's gas, because the lessor has no gas to sell. An oil and gas lease conveys to the lessee title to the gas in place, subject only to the contractual obligation to pay royalty on gas, if, as, and when produced. *See Stanolind Oil & Gas Co. v. Barnhill*, 107

10. One commentator has argued that the "good faith" language in *Amoco v. First Baptist Church*, is not a higher standard but just one aspect of the reasonable prudent operator standard. The reasonable prudent operator standard is comprised of three elements: to act in good faith, with competence, and with due regard to the interest of the lessor as well as its own interest. John S. Lowe, *Developments in Nonregulatory Oil and Gas Law*, 39 INST. ON OIL & GAS L. & TAX'N § 1.03(2)(b) p. 1–17 to 1018 & n. 68 (1988).

11. The court states:
*Amoco Production Co. v. First Baptist Church of Pyote*, was announced by the court on No-

vember 5, 1980. In this case, the court of appeals recognized an implied covenant by the working interest owner to act in good faith in marketing the gas of its royalty owners. Later, on September 21, 1981, our court announced its decision in *Amoco Production Co. v. Alexander*, 622 S.W.2d 563 wherein the court held that the standard of care owed by lessees to lessors in fulfilling implied covenants was that of a reasonably prudent operator. Being the latest pronouncement by this court on the question of the duty of lessees to their lessors, *Alexander* is dispositive on this issue.

S.W.2d 746 (Tex.Civ.App.—Amarillo 1937, writ ref'd). The parties to the lease are free to decide and to define what returns from the lease are to be regarded as "royalty." Walter Cardwell, *Do Producers Owe Royalty On Take–Or–Pay Settlements?*, in STATE BAR OF TEXAS ADVANCED OIL, GAS AND MINERAL LAW COURSE S–2 (1991). The lease transaction offers an opportunity for the lessor to receive royalty with only limited risks (mainly, the risk the lessee will not develop the lease and that drainage will remove the oil and/or gas from under the lease before the royalty owner can receive royalty from production by its lessee). John P. Bowman, *Marketing Gas to Affiliates: A Producer Perspective*, in STATE BAR OF TEXAS ADVANCED OIL, GAS AND MINERAL LAW COURSE T–23 (1991). On the one hand the lessee pays a bonus, takes the risks, assumes the production costs, provides lease use gas to the lessor, and in certain circumstances can lose the lease; while on the other hand the lessor can require the lessee to share information concerning exploration, production, and marketing.[12] *Id.* It does not appear that an imbalance of bargaining power exists generally in the lessor/lessee relationship such that more protection is needed than the reasonably prudent operator standard.

Even if the insurance analogy is correct, in determining whether an insurer has breached the duty of good faith and fair dealing, a two part test is imposed. The first part of the test requires an objective determination of whether a reasonable insurer under similar circumstances would have delayed or denied the claimant's benefits. *Aranda*, 748 S.W.2d 210, 213 (Tex.

1988). The second part balances the right of an insurer to reject an invalid claim, and the duty of the carrier to investigate and pay compensable claims. Carriers maintain the right to deny invalid or *questionable* claims and will not be subject to liability for an erroneous denial of a claim. *Id.* (Emphasis added). If an insurance company has a reasonable basis for denying the benefits, it cannot be guilty of bad faith and unfair dealing in settling a claim. *Id.*

> This determination to deny the claim is not to be based on the insurer's success or failure in court on liability for the claim. The denial may be erroneous and still be in good faith if it is based upon the information which was available to the insurer at the time of the denial and which supported the denial of the claim.

*St. Paul Guardian Ins. Co. v. Luker*, 801 S.W.2d 614, 621 (Tex.App.—Texarkana 1990, no writ). In this case, there was no settled case law which determined that Hurd owed the royalty owners royalty with respect to the settlement of a take-or-pay claim, or that Hurd was required to consult with the royalty owners, who were not third party beneficiaries to the gas contract, prior to settling the take-or pay claim. In fact, two cases have specifically held that the royalty obligations are determined from the lease agreements which are executed prior to and are wholly independent of the gas contracts. *Exxon Corp. v. Middleton*, 613 S.W.2d 240, 245 (Tex.1981); *Texas Oil & Gas Corp. v. Vela*, 429 S.W.2d 866, 870–71 (Tex.1968).[13] Hurd testified that he did not consider the settlement to belong in part to the Bruni Trust because it did not reflect gas which had been sold but was a penalty imposed upon UTTCO for

12. Because take-or-pay provisions are intended to apportion the risks of natural gas production, it follows that the benefits from those provisions should not be shared by royalty owners. Royalty owners are allowed to reap the benefits through royalty payments without having to shoulder the associated risks of exploration, production, and development. Walter Cardwell, *Do Producers Owe Royalty On Take–Or–Pay Settlements?*, in STATE BAR OF TEXAS ADVANCED OIL, GAS AND MINERAL LAW COURSE S–7 (1991) (citing *Diamond Shamrock*

*Exploration Corp. v. Hodel*, 853 F.2d 1159, 1167 (5th Cir.1988)).

13. It seems to follow that because the lessors are not subject to the burdens of gas contracts, they are also not entitled to the take-or-pay benefits unless expressly provided for in the lease. Frank Douglass, *Tort Liability Between Lessors and Lessees—The Duty of Good Faith and Fair Dealing (If Any), Punitive Damages, Royalty Owner Exposure*, in STATE BAR OF TEXAS ADVANCED OIL, GAS AND MINERAL LAW COURSE I–11 (1991)

not performing under the contract between Hurd and UTTCO. One of the trustees even testified that this controversy was a brand new area of law as to whether a royalty owner was entitled to share in the settlement.[14] Although experts testified concerning Hurd's settlement, the opinions ranged from those who felt Hurd had not acted as a reasonably prudent operator to others who felt that Hurd had acted reasonably. In applying the reasonably prudent operator standard, the jury resolved the question in favor of Hurd. In fact, by finding that Hurd had not failed to reasonably market, meaning to "undertake such action in selling gas as a reasonably prudent operator would have done under the same or similar circumstances, having due regard for the interest of all interested parties and to obtain the highest price that was reasonably obtainable," it appears that the jury did find that Hurd did have regard for the Trust's interest. Bruni also asserts, as further evidence of the unequal bargaining power between the parties, that at no time did the Bruni Trust under its lease with Hurd have any right to take gas in kind nor did they ever exercise, either directly or indirectly, any effort with regards to the marketing of gas because the sole responsibility was on Hurd and Killam as joint operators. Bruni claims Hurd never consulted with any of the trustees in any manner with regard to the marketing of the gas on behalf of the Bruni Trust. However, as previously mentioned, it was the Bruni Trust which prepared the lease for Hurd's signature, and it could have required Hurd to consult with the Trust in marketing the gas if that had been its desire, and in fact in later leases the Trust did include such a provision.[15] *See Mid-*

*American Oil & Gas v. Borchers*, 597 S.W.2d 803 (Tex.Civ.App.—Eastland 1980, writ ref'd n.r.e.) (royalty owners did not want lessee and pipeline to renegotiate contract to their detriment so entered into letter agreement where they became a party to the gas contract). Moreover, there is no evidence that the Bruni Trust was in a position any different, with respect to the gas contract, than other royalty owners who enter into standard oil and gas leases. Ernest Bruni testified that the Trust had made approximately 300 leases since its inception, and the duties of the trustees were to oversee the leases, making sure other oil companies were not draining from their land, talk to oil companies about prices, invest money on behalf of the Trust, and file lawsuits on its behalf. There was no evidence that the relationship between the parties was more than that of lessor/lessee. Although the duty of utmost good faith has been recognized as the duty owed by the owner of the executive rights of the mineral estate to the non-executives, such is not the case here. *Manges v. Guerra*, 673 S.W.2d 180, 183 (Tex.1984) (duty requires holder of executive right to acquire for the non-executive every benefit exacted for himself). No evidence was presented that Hurd had acquired influence over the Bruni Trust or abused any confidence. The evidence does support the contention that the relationship between the parties was purely a business relationship which alone cannot establish a confidential relationship. *Consolidated Gas & Equip. Co. v. Thompson*, 405 S.W.2d 333 (Tex. 1966).

Recently, the supreme court in construing the relationship between a fiduciary duty and the duty of good faith stat-

14. Because of the confusion in the take-or-pay settlement area, the Bruni Trustees understandably were compelled to pursue the claim in order to fulfill their own fiduciary responsibilities.

15. It is recommended that a provision be included in the lease which "contractually entitles the royalty owner to share in not only contractual take or pay and similar benefits but also in any benefits derived from the modification, amendment or termination of such provision." Donato D. Ramos, *Direct Marketing Issues—Roy-*

*alty Owner's Perspective,* in STATE BAR OF TEXAS ADVANCED OIL, GAS AND MINERAL LAW COURSE U–9 (1991) (footnote omitted). The lease should also provide that the operator provide in its gas purchase contract that the royalty owner is a third party beneficiary. *Id.* In addition, it is also recommended that the standard of conduct paragraph or clause be drafted in a manner that it "does not foreclose the royalty owner from being able to pursue an action in tort against the operator where warranted for breach of the standard." *Id.* at U–13.

ed that "[t]he duty of good faith and fair dealing merely requires the parties to 'deal fairly' with one another and does not encompass the often more onerous burden that requires a party to place the interest of the other party before his own, often attributed to a fiduciary duty." *Crim Truck & Tractor Co. v. Navistar Int'l Transp.*, 823 S.W.2d 591, 592 (Tex.1992). "[A] party to a contract is free to pursue its own interest, even if it results in a breach of that contract, without incurring tort liability." *Id.* at 593. Bruni makes good arguments that the "reasonably prudent operator" standard is too lenient when applied to take-or-pay settlement proceeds where the right of recoupment is negotiated away. Nevertheless, given the Texas Supreme Court's language in *Hagen,* and other authorities cited herein, we hold that a confidential relationship must exist to give rise to the duty of good faith and fair dealing. The existence of a confidential relationship is usually a question of fact except when the issue is one of no evidence, it then becomes a question of law. *Crim Truck & Tractor Co. v. Navistar Int'l Transp.*, 823 S.W.2d at 592. We further hold as a matter of law that no "confidential relationship" existed between Hurd and Bruni as that term is presently defined in Texas law. Point of error two is sustained.

■ Because points one and two are sustained, point three concerning Bruni's recovery of attorney's fees is necessarily sustained as well.

Accordingly, the judgment of the trial court is reversed, and judgment is rendered that Bruni take nothing on its claim.