ALAMEDA CORPORATION, Appellant,

v.

TRANSAMERICAN NATURAL GAS
CORPORATION, Appellee.

No. 14–96–00044–CV.

Court of Appeals of Texas,
Houston (14th Dist.).

March 27, 1997.

Rehearing Overruled July 3, 1997.

Murray Fogler, Thomas R. McDade, William P. Maines, Houston, for appellant.

David M. Gunn, Bellaire, Graham Kerin Blair, Richard P. Bianchi, Houston, for appellee.

Before MURPHY, C.J., and ANDERSON and O'NEILL, JJ.

## OPINION

O'NEILL, Justice.

TransAmerican Natural Gas Corporation ("TransAmerican")[1] and El Paso Natural Gas Co. ("El Paso") were parties to a long term gas purchase contract under which El Paso agreed to take or pay for gas produced by TransAmerican. When the market took a dramatic downturn, a dispute arose between the parties over their contractual obligations. El Paso ultimately paid TransAmerican some $360 million in exchange for a release of its obligations under the contract. In connection with the settlement, El Paso relinquished its right to recoup gas paid for but not taken. Alameda Corporation ("Alameda"), a royalty owner, filed this suit to collect a royalty share of the settlement. Acknowledging that royalty is not due on take-or-pay settlements under Texas law, Alameda presents us with the question of whether it may collect royalty on that portion of the settlement alleged to represent damages for "repudiation" of the gas purchase contract. We conclude that the settlement proceeds, however classified, do not represent payment for gas produced under the contract and therefore, no royalty is due Alameda. Accordingly, we affirm the judgment of the trial court.

### I. Background[2]

Alameda owns a non-participating royalty interest (NPRI) in approximately 23,000

---

1. Although it has undergone several name changes, for the sake of simplicity we will refer to the appellee as TransAmerican.

2. We rely in part on the factual recitations in *TransAmerican Natural Gas Corp. v. Finkelstein,* 933 S.W.2d 591, 600–604 (Tex.App.—San Antonio 1996, writ requested) (opinion on motion for rehearing *en banc*), in which another royalty

acres of land in Zapata County, Texas, known as the La Perla Ranch.[3] In 1975, TransAmerican acquired a working interest in the La Perla Ranch from El Paso pursuant to a farmout agreement, which gave El Paso the preferential right to purchase gas. TransAmerican engaged in extensive exploration and production of oil and gas on the La Perla Ranch and, in February 1981, El Paso exercised its preferential purchase right by entering into a 15–year gas purchase agreement with TransAmerican. Under the agreement, TransAmerican dedicated its entire interest in the La Perla Ranch gas to El Paso, and El Paso agreed to buy the gas at the maximum lawful price allowed under the Natural Gas Policy Act. The agreement contained a take-or-pay provision, which obligated El Paso to take or, if it did not take, to pay for 80% of the La Perla production over the contract term.[4] If gas was paid for but not taken, El Paso had a five-year right of recoupment, meaning it could later take such gas "at the delivery price minus the take-or-pay payment."[5] During the first years of the agreement, El Paso took and paid for gas at the contract price and Alameda received its royalty. When natural gas prices dramatically declined in the mid–1980s, however, El Paso stopped taking gas.

In 1985, El Paso filed a declaratory judgment action seeking to nullify the gas purchase agreement. TransAmerican counterclaimed for breach of contract based on El Paso's underpayment for gas produced and delivered before 1985, and its failure to make take-or-pay payments in 1985 and 1986. The trial court found that El Paso was bound by the take-or-pay provision, whereupon El Paso repudiated the contract. TransAmerican amended its counterclaim to include a claim for damages attributable to El Paso's repudiation of its future contractual obligations. TransAmerican ultimately obtained a judgment against El Paso in excess of $621 million, which was subsequently remitted to some $480 million.

TransAmerican and El Paso reached a settlement while the case was on appeal. Pursuant to the settlement (1) the parties canceled all agreements between them, including the gas purchase agreement, (2) El Paso paid TransAmerican $302 million in cash, and (3) El Paso conveyed to TransAmerican its mineral interest in the La Perla Ranch, which TransAmerican valued at $58 million. El

owner claimed a royalty share of the same El Paso settlement proceeds.

3. The chain of acquisition to Alameda is as follows. In May 1941, the National Bank of Commerce, as trustee, sold the La Perla Pasture a/k/a the La Perla Ranch to Somerset Land and Cattle Company without reserving or excepting any mineral rights. In May 1964, but effective February 1964, Somerset conveyed to Robert Mosbacher an undivided 3/64ths of 8/8ths perpetual NPRI in the oil, gas and other minerals under certain acreage in the La Perla Ranch. In 1976, effective as of February 1974, Mosbacher assigned to M.T. Arnold an undivided 47½% of the La Perla NPRI. In March 1982, effective September 1978, Arnold assigned all of his NPRI to Alameda.

4. A standard take-or-pay clause, such as this one, requires the pipeline-purchaser either to take (and pay at the maximum lawful price) a specified quantity of natural gas during each contract year or to make a single annual payment to the producer to the extent that the volumes taken during any contract year fall short of the minimum annual contract quantity. *Diamond Shamrock Exploration Co. v. Hodel*, 853 F.2d 1159, 1164 (5th Cir.1988). During a contract year, the producer receives monthly payments only for the gas actually taken. *Id.* At the end of the contract year, volumes of natural gas production actually taken are compared with the minimum contract volume. *Id.* In the event the pipeline has actually taken less than the contract volume, the pipeline must then make an annual lump-sum payment, the take-or-pay payment, representing the difference between the minimum contract volume for that year and the actual volume taken. *Id.*

5. Whenever the pipeline purchases gas in excess of the contract volume for a subsequent year, that excess gas or "make-up gas" is credited against the earlier deficiency. *Diamond Shamrock*, 853 F.2d at 1164. At the end of a year in which make-up gas is taken the pipeline will receive a single lump-sum refund, or credit, of prior take-or-pay payments made for the earlier deficiency to the extent to which the deficiency has now been made up. *Id.* The refund is calculated on the basis of the price of gas during the month in which the make-up gas was actually taken. *Id.* Although the price paid for these make-up gas deliveries is the price in effect at the time the make-up gas is produced and taken, the payment is made by applying the purchaser's prior take-or-pay payments as a credit towards the purchase price of the make-up gas. *Id.*

Paso relinquished all make-up or recoupment rights in connection with the settlement. Prior to the settlement, TransAmerican sold gas not taken or paid for by El Paso on the spot market, and paid Alameda royalty based on the spot market price, which was considerably lower than the price set by the gas purchase agreement. TransAmerican did not pay Alameda royalty on the $360 million settlement.

In May 1993, Alameda brought this suit against TransAmerican seeking a share of the El Paso settlement proceeds based in part on theories of unjust enrichment and breach of the duty to reasonably market the gas. Alameda sought to recover its royalty share of the settlement proceeds attributable to El Paso's repudiation. The parties filed cross-motions for partial summary judgment. The court denied Alameda's cross-motion and granted TransAmerican's motion on the ground that Alameda was not entitled to any damages "based in whole or in part" on the El Paso settlement proceeds. The court determined, however, that TransAmerican was not entitled to summary judgment on the issue of whether it breached the duty to market by failing to use reasonable care in terminating the gas purchase contract with El Paso pursuant to the settlement. After a three-day trial on this issue, the jury found that TransAmerican did not breach its duty to market the gas.[6] The trial court entered a take-nothing judgment in accordance with the jury's verdict and Alameda perfected this appeal.

## II. Discussion

Although this appeal is from the judgment entered on the jury's verdict, all of Alameda's points of error turn on the propriety of the trial court's summary judgment ruling that Alameda was not entitled to royalty on any portion of the El Paso settlement proceeds. We will therefore begin by addressing this issue as raised by Alameda's first and fifth points of error.

■ When both parties move for summary judgment and one motion is granted but the

other denied, as in the present case, the reviewing court determines all issues presented by the motions. *Jones v. Strauss,* 745 S.W.2d 898, 900 (Tex.1988). The appellate court may reverse the trial court's judgment and render such judgment that the trial court should have rendered, including rendering judgment for the other movant. *Id.* A movant for summary judgment has the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Nixon v. Mr. Property Management Co.,* 690 S.W.2d 546, 548–49 (Tex.1985); *Montgomery v. Kennedy,* 669 S.W.2d 309, 310–11 (Tex.1984). In the present case, there are no disputed fact issues. Rather, the parties disagree over the trial court's application of the law.

## A. Royalty On Settlement Proceeds

Alameda acknowledges that take-or-pay settlement proceeds are not royalty bearing in Texas. *Killam Oil Co. v. Bruni,* 806 S.W.2d 264, 266–68 (Tex.App.—San Antonio 1991, writ denied) (hereinafter *"Bruni I "*). Alameda claims, however, the bulk of the El Paso settlement was not for take-or-pay damages but for El Paso's repudiation of the gas purchase agreement. Because El Paso relinquished its make-up rights, Alameda claims, it is "as if the gas had been produced, delivered, taken and paid for, including the portion attributable to any royalty interest." Therefore, according to Alameda, *Bruni I* and a long line of similar cases do not apply.

To support its position, Alameda relies upon dicta contained in a footnote in *Hurd Enterprises, Ltd. v. Bruni,* where the court states "there are cogent arguments concerning the royalty owner's interest in take-or-pay settlement funds, especially when, as here, the settlement terminates the purchaser's recoupment rights." 828 S.W.2d 101, 106–107 n. 8 (Tex.App.—San Antonio 1992, writ denied) (hereinafter *"Bruni II "*). Those arguments are that relinquishment of the right to recoup gas paid for but not taken (1) has the practical effect of increasing the price paid for gas actually produced, (2) cre-

---

6. *Alameda's unjust enrichment theory was not submitted to the jury and is not an issue in this*  appeal.

ates a windfall for the producer, and (3) deprives the royalty owner of a subsequent opportunity to share in the lump sum payment when the paid for, but unproduced, gas is later produced and sold at less than the contract price. *Id.* (citing ERNEST E. SMITH & JACQUELINE LANG WEAVER, TEXAS LAW OF OIL AND GAS Vol. 1, § 4.6(E)(6) p. 215 (Issue 2, Butterworth 1991) and Frank Douglass, *Tort Liability Between Lessors and Lessees—The Duty of Good Faith and Fair Dealing (If Any), Punitive Damages, Royalty Owner Exposure,* STATE BAR OF TEXAS, ADVANCED OIL, GAS AND MINERAL LAW COURSE I–10 (1991)).

■ Although the recoupment issue was not before the court in *Bruni II* and thus not addressed, the court recognized that resolution of the issue turned on whether the take-or-pay payment should be considered as payment for production or payment for nonproduction:

> The legal issue is whether the nonrecoupable take-or-pay payment is compensation for past and/or future gas production, or whether it represents payment for the producer having the gas available but not producing it, i.e. storing the gas for the purchaser's benefit.

*Bruni II,* 828 S.W.2d at 106–107 n. 8 (citing Douglass). The nature of the take-or-pay payment has since been defined. In *Lenape Resources Corp. v. Tennessee Gas Pipeline Co.,* 925 S.W.2d 565, 570 (Tex.1996), the Supreme Court held that the pay option under a take-or-pay contract is *not* a payment for the sale of gas, as Alameda contends, but a payment for the exclusive dedication of reserves for a fixed period of time. Therefore, nonrecoupable proceeds received in settlement of a take-or-pay contract, whether allocated as "take-or-pay" damages or "repudiation" damages, are actually payment for nonproduction and thus are not royalty bearing.

■ In *TransAmerican Natural Gas Corp. v. Finkelstein,* 933 S.W.2d 591 (Tex.App.—San Antonio 1996, writ requested) (opinion on motion for rehearing *en banc*), the court was faced with the identical issue and reached the same conclusion. There, another La Perla Ranch royalty owner sought to collect royalty from TransAmerican on the same El Paso settlement proceeds characterized as "repudiation" damages in the present case. *Id.* at 593–95. The court stated the issue as "whether a royalty owner is entitled to share in the settlement proceeds arising from the breach of a take-or-pay gas contract when some of the gas not taken is sold on the spot market." *Id.* at 593. Rejecting the royalty owner's claim, the court constructed its analysis on certain principles well-settled under Texas law. For example, it has long been recognized that the payment of royalties must be determined from the provisions of the oil and gas lease. *Bruni I,* 806 S.W.2d at 266 (citing *Texas Oil & Gas Corp. v. Vela,* 429 S.W.2d 866, 870 (Tex.1968)). The standard gas royalty clause is tied to production and has been construed according to its plain meaning; royalty is not due "unless and until actual production, the severance of minerals from the formation, occurs." *Bruni I,* 806 S.W.2d at 267 (citing *Diamond Shamrock,* 853 F.2d at 1165). Consequently, royalty is not due on settlement proceeds arising from take-or-pay provisions because these payments are made when gas is not produced and, as such, bear no royalty. *Bruni I,* 806 S.W.2d at 268. *See Neel v. HECI Exploration Co.,* 942 S.W.2d 212, 219–19 (Tex.App.—Austin 1997 writ granted) (opinion on second motion for rehearing); *Bruni II,* 828 S.W.2d at 103–106; *Mandell v. Hamman Oil and Refining Co.,* 822 S.W.2d 153, 164–63 (Tex.App.—Houston [1st Dist.] 1991, writ denied).

Finkelstein, like Alameda in the present case, contended these well-established principles did not apply to his claim because he sought royalty based upon that portion of the El Paso settlement proceeds attributable to repudiation, not to the take-or-pay provision. *Finkelstein,* 933 S.W.2d at 598. In support of his position, Finkelstein asserted the same "cogent arguments" noted in *Bruni II.* The court reiterated that these arguments presupposed the characterization of nonrecoupable take-or-pay payments as compensation for production. *Id.* at 599. Because the Supreme Court in *Lenape* rejected this characterization and determined that take-or-pay

payments represent nonproduction, the court found that Finkelstein's arguments were no longer viable. *Id.* Nevertheless, the court addressed Finkelstein's concerns regarding the effects of such a classification.

First, Finkelstein claimed that disallowing royalty on the alleged repudiation portion of the settlement where El Paso gave up its recoupment rights would have the effect of increasing the price paid for gas taken on the spot market. *Id.* The court, however, refused to impute this production to El Paso, emphasizing that the gas was sold on the spot market to third parties, not to El Paso. *Id.* Even if El Paso was allowed a "credit" for gas TransAmerican sold on the spot market in mitigation of its alleged repudiation damages, this did not change the nature of the settlement as the compromise of a dedication claim that existed independently of the lease. *Id.* at 599–600. Finding a royalty due on the compromise of a dedication claim would allow the royalty owner to receive "two royalties for the same gas, a right to which he was not entitled under the terms of his lease." *Id.* at 599. Finkelstein could have included a provision that allowed for a royalty payment upon proceeds from settlements arising from the breach of take-or-pay contracts, but did not. *Id.* at 598. The court concluded that Finkelstein's royalty rights were limited to the gas produced and sold on the spot market because that gas, "by definition, was not included in El Paso's take-or-pay settlement." *Id.* at 600.

Second, Finkelstein claimed that, by refusing to pay royalty on so-called repudiation damages, TransAmerican received an unfair windfall. In *Diamond Shamrock v. Hodel,* the court rejected this argument and explained that the purpose of take-or-pay payments is to compensate the producer, not the mineral owner:

> Take-or-pay payments are intended to compensate primarily the producer, not the owner of the minerals, for the risks associated with development production. In fact, this is the precise reason for entering into a lease agreement . . . the take-or-pay obligation ensures to the producer a continuous source of revenue to cover investment, operations, and maintenance. Most of these costs have either been or will continue to be incurred, regardless of whether the purchaser takes any gas. The lessee is the exclusive bearer of these risks.

*Diamond Shamrock,* 853 F.2d at 1167; *see Exxon Corp. v. Middleton,* 613 S.W.2d 240, 241–45 (Tex.1981) (opinion on rehearing) and *Texas Oil & Gas Corp. v. Vela,* 429 S.W.2d 866, 870 (Tex.1968) (both holding that lease agreement and gas contract are two separate and distinct transactions and that producer's royalty obligations are fixed and unaffected by its gas contracts). The *Finkelstein* court emphasized that "the royalty owner . . . does not 'shoulder the . . . risks of exploration, production, and development,' and [therefore] should not share in the take-or-pay payment." *Finkelstein,* 933 S.W.2d at 599 (citing *Diamond Shamrock,* 853 F.2d at 1164). The court noted if market prices had gone up instead of down, the royalty owner would not be seeking to share in the losses caused by the producer being locked into a lower contract price. *Id.* at 1163 n. 8. Thus, the court concluded TransAmerican did not receive an unfair windfall from the El Paso settlement proceeds.

Finally, the court rejected Finkelstein's attempt to characterize the El Paso settlement as including both "take-or-pay damages" for gas "that was not produced" (of which the royalty owner disclaimed any interest) and "repudiation damages" for "the entire El Paso contract" (of which the royalty owner claimed an interest as to gas produced and sold on the spot market). *Id.* at 599. While the settlement did not make a distinction between take-or-pay and repudiation damages, the court suggested any such distinction made by the court or TransAmerican was merely for convenience because past damages were "readily ascertainable" while future damages were not. *Id.* The court concluded "a breach is a breach," and "both awards represent[ed] nonproduction—gas not taken or paid for under the gas purchase agreement." *Id.*

■ We agree with the *Finkelstein* court's analysis. Like the royalty owners in *Bruni I* and *Finkelstein,* Alameda's royalty interest

was tied to production. Specifically, the assignment to Alameda stated:

> Whenever a royalty interest is described ... it shall mean that the interest herein conveyed constitutes said fraction of 8/8ths of the *production* of oil and gas from the lands herein described.

(emphasis added). Similarly, the assignment did not provide for royalty to be paid upon proceeds from settlements arising from the breach of take-or-pay gas contracts. If gas was produced, royalty was to be "calculated and based on the price received by the Mineral Owner at the wellhead." As the trial judge aptly stated, "[a] standard take-or-pay settlement covering a future repudiation claim necessarily includes a payment for gas neither taken nor paid for in the future." The *Finkelstein* court, on nearly identical facts, rejected Alameda's arguments that (1) the settlement and termination of El Paso's recoupment rights had the effect of increasing the price of gas produced, (2) the settlement and termination of El Paso's recoupment rights created an unfair windfall for TransAmerican, and (3) the portion of the settlement attributable to El Paso's repudiation was for the future production of gas. *Finkelstein,* 933 S.W.2d at 598–600. We believe that a royalty owner's right to payment under these circumstances is no longer an open question in Texas. *Id,* see *Lenape,* 925 S.W.2d at 570; *see also Bruni II,* 828 S.W.2d at 106 n. 8.

■ Alameda urges us to depart from the above-referenced precedent and follow the so-called "Harrell rule." Thomas A. Harrell, *Developments in Nonregulatory Oil and Gas Law,* 30 Inst. on Oil & Gas L. & Tax'n 311, 334 (1979); *Klein v. Arkoma Production Co.,* 73 F.3d 779 (8th Cir.), *cert. denied,* — U.S. ——, 117 S.Ct. 65, 136 L.Ed.2d 27 (1996) (applying Arkansas law); *Williamson v. Elf Aquitaine, Inc.,* 925 F.Supp. 1163 (N.D.Miss. 1996), *certifying question to 5th Cir.,* 1996 WL 671660 (N.D.Miss., July 25, 1996); *Independent Petroleum Ass'n of America v. Babbitt,* 1995 WL 431305 (D.D.C. June 14, 1995), *reversed,* 92 F.3d at 1248, 1259–60 (D.C.Cir. 1996). Looking beyond the plain meaning of the standard gas lease that ties payment of royalties to "production," the "Harrell rule"

considers the gas lease a co-operative venture where "the lessor contribut[es] the land and the lessee contribut[es] the capital and expertise necessary to develop the minerals for the mutual benefit of both parties." *Harvey E. Yates Co. v. Powell,* 98 F.3d 1222 (10th Cir.1996) (citing Harrell). The "co-operative venture" theory, however, is derived from unique state statutes that expand the definition of "royalty" in mineral leases. *Yates,* 98 F.3d at 1234. Most states have no such legislation and therefore, these cases "may stand alone." *Id.* at 1233 (citing John S. Lowe, *Defining the Royalty Obligation,* 49 SMU L.REV. 223, 257 (1996)). In fact, the co-operative venture theory "has not ... received very much additional support, and several recent cases have eschewed that approach in favor of a literal reading of the lease terms." *Yates,* 98 F.3d at 1234 (citing *Independent Petroleum,* 92 F.3d at 1259–60). Accordingly, we decline Alameda's invitation to depart from precedent and follow the minority "co-operative venture" rule. Points of error one and five are overruled.

## B. Collateral Estoppel

■ In its second point of error, Alameda contends the trial court erred in refusing to apply the doctrine of collateral estoppel to preclude TransAmerican from relitigating the issue of whether it breached its duty to reasonably market the gas. The collateral estoppel claim was based upon the jury's finding in *Finkelstein* that TransAmerican had breached its duty to market the gas by failing to pay royalty on the alleged repudiation portion of the El Paso settlement proceeds. Since Alameda filed its brief in this appeal, however, the San Antonio Court of Appeals has rejected the *Finkelstein* jury's finding for the reasons already discussed. As a result, we believe this point of error to be moot.

■ Nevertheless, collateral estoppel does not apply to the question of law presented in this appeal. *See Tankersley v. Durish,* 855 S.W.2d 241, 245 (Tex.App.—Austin 1993, writ denied) (noting that courts disfavor application of collateral estoppel to pure question of law). The lessee/producer's covenant

to market pertains to the *production* of gas, i.e. "the lessee must make certain that *gas that is produced* is sold for the best price or under the best terms." *Mandell,* 822 S.W.2d at 164. It is undisputed that TransAmerican obtained the best price available for the gas that was produced and sold on the spot market. This gas, "by definition, was not included in El Paso's take-or-pay settlement." *Finkelstein,* 933 S.W.2d at 600. Because no gas was produced to El Paso, the settlement proceeds cannot constitute damages for breach of the marketing covenant. Without production under the El Paso contract, TransAmerican's duty to market was not triggered as a matter of law. *See Mandell,* 822 S.W.2d at 164–65. Point of error two is overruled.

### C. Remaining Contentions

In points of error three and four, Alameda contends the trial court erred in (1) excluding certain documents relating to the allocation of damages in the El Paso litigation, and (2) failing to submit a question to the jury regarding allocation of damages under the El Paso settlement. As already stated, the resolution of these issues turns upon the propriety of the trial court's summary judgment ruling. Because the trial court correctly ruled as a matter of law that Alameda was not entitled to any portion of the El Paso settlement proceeds, the court did not err in excluding the complained of evidence or refusing to submit Alameda's proposed jury question. Points of error three and four are overruled.

### III. Conclusion

Because the El Paso settlement proceeds represented payment for gas not produced under the gas purchase contract, no royalty was due Alameda and the trial court properly granted TransAmerican summary judgment. Likewise, the trial court properly denied summary judgment for Alameda on the basis of collateral estoppel. Accordingly, the judgment of the trial court is affirmed.